## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEW ENTERPRISE ASSOCIATES 14, L.P., NEA VENTURES 2014, L.P., NEA:SEED II, LLC, and CORE CAPITAL PARTNERS III, L.P., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2022-0406-JTL |
| GEORGE S. RICH, SR., DAVID RUTCHIK, JOSH STELLA, FUGUE, INC., GRI VENTURES, LLC, JMI FUGUE, LLC, RICH FAMILY VENTURES, LLC, and RUTCHIK DESCENDANTS' TRUST, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION ADDRESSING MOTION TO DISMISS UNDER RULE 12(b)(6)

Date Submitted: January 24, 2023
Date Decided: March 9, 2023

C. Barr Flinn, Paul J. Loughman, Michael A. Carbonara, Jr., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michele D. Johnson, LATHAM & WATKINS LLP, Orange County, California; Eric Leon, Nathan Taylor, Meredith Cusick, Amanda R. Kurzydlowski, LATHAM & WATKINS LLP, New York, New York; *Counsel for Plaintiffs*.

John P. DiTomo, Sebastian Van Oudenallen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington Delaware; Patrick Montgomery, Paul Weeks, KING & SPALDING LLP, Washington, DC; *Counsel for Defendants*.

**LASTER, V.C.**

Fugue, Inc. (the "Company") is a startup that spent six months looking for a buyer. No one was interested. After declaring the sale process a failure, the Company needed capital.

Management represented that a financing round led by an investor named George Rich was the only available option. In return for the financing, the Company agreed to issue shares of preferred stock that carried powerful blocking rights. Rich brought David Rutchik and other investors into the round, and all received shares of preferred stock.

Three months after the recapitalization, the Company had $8 million on its books, was no longer in distress, and had received a preliminary inbound expression of interest from a potential acquirer. Rich, Rutchik, and the Company's CEO comprised the board of directors (the "Board"). The Board approved a transaction in which selected preferred stockholders, including Rich and Rutchik, purchased additional shares at the original issue price, set when the Company was in distress. The directors also granted themselves millions of options, with the strike price set at one tenth of the value of the common stock implied by the recapitalization.

The preliminary expression of interest blossomed into an acquisition at a healthy valuation. When the transaction closed, the preferred stockholders received a return of nearly 750%. The option holders received a return of 3,200%. Those gains came at the expense of other Company stockholders, who suffered dilution from those equity issuances and therefore received a lesser share of the merger consideration.

The plaintiffs are two investors who had funded the Company before the recapitalization. One of the plaintiffs had a right of first offer ("ROFO") that applied to

any issuance of securities. The Company did not honor the ROFO for the second offering of preferred stock. That plaintiff has stated a claim for breach of contract, as well as a claim for tortious interference with contract.

The plaintiffs have attempted to assert claims for breach of the duty of disclosure. They argue that when asking a subset of the preferred stockholders to execute a written consent approving the second offering of preferred stock, the directors had an obligation to disclose that the Company had received a preliminary expression of interest from a potential acquirer. That claim would fail in the context of a publicly traded entity. Under the facts and circumstances present in this case, it is reasonably conceivable that the information was material given that (i) the Company had told its investors three months earlier that its process of exploring alternatives had failed, (ii) management had simultaneously told its investors that it would take two to three years before the Company had built up its business to a point where it could be sold, and (iii) the directors were seeking approval to sell shares of preferred stock to selected investors, including two insiders, at the same distressed price set in the recapitalization.

The additional twist is that the plaintiffs do not allege that the directors had a duty to disclose the existence of the expression of interest to them. They allege that the directors breached a duty to disclose the expression of interest to *other* stockholders, resulting in injury to the plaintiffs when those stockholders were misled into approving the second offering at the same price paid in the recapitalization. Although this decision holds that the plaintiffs can assert that cause of action, the resulting claim is derivative,

and the plaintiffs' standing to assert it was extinguished when the Company was sold. The same is true for the plaintiffs' related claims against other defendants.

The plaintiffs have sued the directors for breaching their fiduciary duties in connection with the sale of the Company. The plaintiffs contend that the second offering of preferred stock and the option grants were interested transactions, and they challenge the sale of the Company as unfair because it conferred a unique benefit on the directors by extinguishing any sell-side stockholder's standing to pursue derivative claims challenging those issuances, even though the merger consideration failed to afford any value to those derivative claims. The plaintiffs have standing to challenge the merger on that basis, and they have stated viable claims for breach of fiduciary against the directors and against Rich's affiliates as controlling stockholders, as well as a viable claim against Rutchik's affiliate for aiding and abetting breaches of fiduciary duty.

The defendants have an additional argument for dismissal that this decision does not reach. As part of the recapitalization, the plaintiffs entered into a voting agreement that contained a drag-along right. The plaintiffs covenanted not to sue the defendants over any transaction that met the conditions of the drag-along right. The court will address the implications of the covenant not to sue in a separate decision.

3

# I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents that it incorporates by reference.[1] At this procedural stage, the plaintiffs are entitled to have the court credit their allegations and draw all reasonable inferences in their favor.

## A.     The Company

Founded in 2012, the Company provides tools to build, deploy, and maintain a cloud infrastructure security platform. Josh Stella was a co-founder of the Company and serves as its Chief Executive Officer.

In 2013, plaintiff Core Capital Partners III, L.P. ("Core Capital") was the lead investor in the Company's seed round. Core Capital is an investment fund sponsored by Core Capital Partners, which describes itself as a venture capital firm headquartered in downtown Washington, D.C., with in excess of $300 million under management across three funds.[2]

In 2014, plaintiffs New Enterprise Associates 14, L.P., NEA Ventures 2014, L.P., and NEA:Seed II, LLC invested in the Company. Each is an investment vehicle or fund sponsored by New Enterprise Associates, a name-brand venture capital firm. The

---

[1] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Sebastian Van Oudenallen, which collects documents incorporated by reference in the operative complaint. Dkt. 14.

[2] Core Capital Partners, http://www.core-capital.com/about (last visited Feb. 16, 2023).

distinctions among the entities are not important for this decision, which for simplicity refers to them as "NEA."

Across multiple rounds of financings, NEA invested a total of $36.1 million in the Company, and Core Capital invested a total of $1.7 million. In return for their investments, NEA and Core Capital received shares of preferred stock. The rights conferred by their preferred stock included an aggregate liquidation preference equal to their invested capital, and NEA and Core Capital each received the right to appoint one member to the Board. During this period, the Board had five members.

## B. The Failed Sale Process And The Recapitalization

In the second half of 2020, the Company began exploring strategic alternatives. The principal goal was to find a potential acquirer. The process continued throughout 2020 and into the first quarter of 2021. During that time, the Company engaged with more than fifteen possible buyers.

Toward the end of the first quarter of 2021, Stella told the Board that the Company's efforts to find a buyer had failed. Stella also represented that that Company was running out of money and needed additional capital to continue operating. He indicated that the Company would use the new money to grow its business and position itself better as an acquisition target. According to Stella, that process would take two to three years.

To provide the growth capital that the Company needed, Stella recommended that the Company engage in a recapitalization that would involve the issuance of Series A-1 Preferred Stock to a group of investors led by Rich (the "Recapitalization"). Stella

5

represented to the Board and the Company's existing investors that the Recapitalization was the only option available and that a market check for other financing sources had not generated any alternatives.

Based on Stella's representations, the Board authorized management to proceed with the Recapitalization.

## C.     The Terms Of The Recapitalization

The Company raised roughly $8 million in the Recapitalization. In return for this capital, it issued 13,129,810 shares of Series A-1 Preferred Stock (the "Preferred Stock"), reflecting a purchase price of $0.61 per share. The Recapitalization valued the Company's pre-transaction equity at $10 million.

Rich invested in the Recapitalization through two vehicles: GRI Ventures, LLC, and JMI Fugue, LLC (together, the "Rich Entities"). Both of the Rich Entities were special purpose vehicles that Rich formed for the investment. Rich controlled those vehicles through Rich Family Ventures, LLC. GRI Ventures was designated as the "Lead Investor" for the round. It invested $4,189,999.51 in return for 6,876,743 shares of Preferred Stock. JMI Fugue invested $999,999.62 in return for 1,641,227 shares of Preferred Stock. Together, the Rich Entities held 8,511,970 of the shares of Preferred Stock, representing 65% of the issuance.

Twenty-three other investors participated in the Recapitalization. Eleven already owned common stock in the Company. Another five were Company employees. Only seven appear to be new investors.

NEA and Core Capital were invited to participate. They declined.

6

For the Company's existing investors, the terms of the Recapitalization were onerous. In the Recapitalization, all of the existing preferred stock was converted into common stock. Before the Recapitalization, the preferred stock held by the Company's investors carried an aggregate liquidation preference of $74.6 million, with $37.7 million associated with shares of preferred stock held by NEA and Core Capital. The conversion into common stock wiped out the liquidation preference.

After the Recapitalization, only the new Preferred Stock carried a liquidation preference. Not only that, but it was a supercharged liquidation preference equal to two times invested capital. The Preferred Stock was also participating preferred, meaning that if there was a liquidity event, the holders of Preferred Stock would (i) receive a payment equal to two times their invested capital before any amounts reached the common stockholders *and* (ii) have the right to participate *pro rata* with the common stockholders in any further distributions.

The effect of the Recapitalization on the existing investors was dramatic. NEA's economic ownership in the Company declined from 32% of the equity value before the Recapitalization to 14% afterward. Core Capital's economic ownership in the Company declined from just under 3% before the Recapitalization to less than 1% afterward.

From a governance standpoint, the effect of the Recapitalization was even more significant. The Company's post-transaction capital structure consisted of 8,921,712 shares of common stock and 13,129,810 shares of Preferred Stock. The Preferred Stock voted on an as-converted basis, giving it 60% of the Company's voting power. The Preferred Stock also carried class voting rights, and the approval of the Preferred Stock

7

voting as a separate class was required for significant corporate actions, including engaging in a merger, a sale of assets, or any issuance of shares; increasing the number of directors; amending the certificate of incorporation or the bylaws; and dissolving the Company. Because the Rich Entities acquired 65% of the issuance, they controlled the voting rights that the Preferred Stock carried. On a fully diluted basis, the Rich Entities owned shares carrying 39% of the Company's voting power.

As part of the Recapitalization, the Company and certain of its stockholders entered into a Fourth Amended and Restated Voting Agreement dated as of April 30, 2021 (the "Voting Agreement"). All of the purchasers of Preferred Stock executed the Voting Agreement, as did twenty-nine holders of common stock, including NEA and Core Capital (the "Signatory Stockholders").

Under the Voting Agreement, the Signatory Stockholders agreed to vote for (i) one director designated by GRI Ventures, who initially was Rich, (ii) a second director designated by the holders of a majority of the Preferred Stock, who initially was Rutchik, (iii) a third director elected by a majority of the Preferred Stock held by investors other than GRI Ventures, who initially was John Morris, (iv) a fourth director who would be the CEO, and (v) a fifth director designated by all the outstanding stock voting together as a single class, who initially was Wayne Jackson. Because the Rich Entities held approximately 65% of the Preferred Stock, they had the contractual authority to designate the first two of the five directors. Because the Rich Entities controlled 39% of the Company's fully diluted voting power, they had an outsized voice in the selection of the fifth director.

8

Morris and Jackson had been directors of the Company before the Recapitalization. Rutchik was one of the twenty-three individuals and entities who participated in the Recapitalization. Through the Rutchik Descendants' Trust (the "Rutchik Trust"), Rutchik paid $324,999.41 to acquire 533,398 shares of Preferred Stock. Rutchik also was affiliated with Nodozac LLC, which paid $99,999.54 to acquire 164,122 shares of Preferred Stock. Through his affiliates, Rutchik acquired a total of 697,520 shares, representing 5% of the issuance.

Section 3.2 of the Voting Agreement contained a drag-along provision that obligated the Signatory Stockholders to support a sale of the Company if approved by the Board and a majority of the Preferred Stock (the "Drag-Along Provision"). As part of the Drag-Along Provision, the Signatory Stockholders agreed not to exercise appraisal rights and covenanted not to sue the directors or their affiliates in connection with a sale of the Company that met the requirements of the Drag-Along Provision (the "Covenant Not To Sue").

NEA negotiated a side letter as part of the Recapitalization (the "Management Rights Letter"). It granted NEA a ROFO if the Company proposed to offer or sell any "New Securities," defined broadly in a related document to mean any additional equity or securities convertible into equity (the "Investor ROFO"). The Investor ROFO required that the Company give notice to NEA of its intent to offer any equity securities for sale,

the number of equity securities to be offered, and the price and terms of the offer, so that NEA could participate in the offering if it chose to do so.[3]

The Recapitalization became effective on April 30, 2021. Shortly before the effective time, Stella and Rich proposed to increase the size of the Recapitalization from $8 million to $10 million. The Board, which still included representatives of NEA and Core Capital, rejected that proposal. It is reasonable to infer that the existing investors did not want to suffer the additional dilution from a larger investment and believed that the slightly smaller investment would fund the Company to a liquidity event. At a minimum, having $8 million on its books would put the Company in a stronger position to negotiate if it sought additional capital.

**D.      An Expression Of Interest**

In late June 2021, something unexpected happened. Guy Podjarny, the founder and CEO of Snyk Limited, contacted Stella about a potential strategic transaction. Snyk is an England-registered corporation with its headquarters in Boston, Massachusetts. Snyk provides a developer security platform.

On June 30, 2021, Podjarny emailed Stella to follow up on a prior conversation they had the week before, writing: "I'd love to engage in a proper chat about a potential deep partnership or (maybe more likely) acquisition." Ex. 5. He advised that Snyk could "dig in reasonably quickly" to determine the terms of a deal, and he suggested signing "a

---

[3] Core Capital also entered into a side letter with the Company, but it primarily addressed information rights and did not include a ROFO.

10

fresh MNDA and a refresh mutual demo." *Id.* He also referenced a desire to "catch you up on what we've been up to since our last conversations," suggesting there had been more than one prior conversation with Stella. *Id.*

The Snyk inquiry was significant. From mid-2020 until the end of the first quarter 2021, the Company had made outbound calls about a potential sale and spoken with fifteen possible buyers. Those efforts had not generated any interest. Now, the Company had received an inbound inquiry from a credible transaction partner who was already known to the Company. The contact was preliminary, but it demonstrated that someone had real interest in the Company. That put a different cast on the Company's situation.

The Board did not disclose Snyk's expression of interest to any of the stockholders. The Board did not share the information with NEA under the Management Rights Letter.

### E.      The Second Offering

On July 14, 2021, Morris and Jackson resigned from the Board, leaving Rich, Rutchik, and Stella as the only three directors. One week later, on July 21, the Board authorized the Company to issue a total of 3,938,941 additional shares of Preferred Stock, which increased the outstanding shares of Preferred Stock by 18% (the "Second Offering").

Rather than treating the Second Offering as a new transaction, the Board decided to amend the terms of the stock purchase agreement governing the Recapitalization to encompass the Second Offering. By doing so, the Board permitted the shares to be issued at the same price and with the same generous terms that Rich and his co-investors had

11

extracted in April 2021 when the Company was low on cash, had no other sources of financing, and had no prospect of a near-term sale. Three months later, the Company had $8 million on its books and had received an inbound expression of interest.

To effectuate the Second Offering, the Board unanimously approved an amendment to the Company's certificate of incorporation (the "Charter Amendment") that increased the authorized number of shares of Preferred Stock from 13,129,810 to 17,068,751. Under Section 242 of the Delaware General Corporation Law (the "DGCL") and the charter, the amendment required three stockholder-level votes: (i) an affirmative vote from holders of a majority of the voting power of the Preferred Shares and the common shares voting together as a single class, (ii) an affirmative vote from holders of a majority of the voting power of the Preferred Shares voting as a single class, and (iii) an affirmative vote from holders of a majority of the voting power of the Preferred Shares excluding the shares held by the Rich Entities, voting as a separate class.

With 65% of the Preferred Stock, the Rich Entities could deliver the second vote by themselves. With 42% of the outstanding voting power between them, Rich and Rutchik only needed support from another 8% to carry the first vote.[4] The third vote was a tougher nut to crack. Net of the Rich Entities' shares, there were 4,617,840 shares of Preferred Stock outstanding. With Rutchik's 697,520 votes in the plus column, they still

---

[4] Before the Second Offering, Rich controlled 8,511,970 shares of Preferred Stock and Rutchik controlled 697,520 shares of Preferred Stock. At the time, there were 8,921,712 shares of common stock outstanding and 13,129,810 shares of Preferred Stock outstanding. $(8,511,970 + 697,520) / (8,921,712 + 13,129,810) = 42\%$.

needed votes from holders of 3,920,320 shares of Preferred Stock. Conveniently, getting

the support from holders of that number of shares of Preferred Stock would carry them

well clear of the number of votes needed for the first vote. With those additional votes

added to the votes that Rich and Rutchik controlled, they would have 60% of the

outstanding voting power for purposes of the first vote.[5]

To obtain the necessary votes, the directors prepared a written consent with

signature blocks for twenty-one different holders of Preferred Stock, four of which were

entities associated with Rich or Rutchik. Ex. 3 (the "Written Consent"). Ten other holders

of Preferred Stock (the "Other Signatories") joined Rich and Rutchik's entities in

executing the Written Consent.[6] The signature lines for seven additional holders remain

blank, supporting an inference that they declined to sign the Written Consent (the "Non-

Signatories").[7]

---

[5] The Rich Entities' 8,511,970 votes plus Rutchik's 697,520 votes plus 3,920,320 votes from additional shares of Preferred Stock = 13,129,810 votes / 22,051,522 outstanding votes = 59.54%.

[6] As a reminder, the two entities associated with Rich are GRI Ventures and JMI Fugue, LLC. The two entities associated with Rutchik are the Rutchik Trust and Nodozac. The other ten holders whose signatures appear on the Written Consent are (1) Peter Jaffee, (2) David Mitchell, (3) Tim Webb, (4) Chris Suen, (5) Ariel Eckstein, (6) Cal Simmons, (7) Gustavo Bessalei and Amada Ali as joint owners, (8) the Jerry Simon Revocable Trust dated June 8, 2016, (9) the Seth Spaulding Trust, and (10) the Legacy Trust LLC. *Id.*

[7] The seven non-signers are (1) Ajaipal S. Virdy, (2) Andrew Seligson, (3) David Morris, (4) Ted Niedermeyer, (5) Ankush Khurana (6) Tyler Mills, and (7) Neil Glick and William Boone Campbell as joint owners. *Id.*

13

Four of the Other Signatories received the right to purchase shares of Preferred Stock in the Second Offering at the same favorable price Rich had secured in April 2021 when the Company needed capital and seemed to have no other options.[8] That made them interested in the transaction they were approving. Another (Chris Suen) was a Company employee and, as such, was not disinterested in the transaction that he approved. Ex. 3. Only five of the Other Signatories appear to not to have participated in the Second Offering or to have ties to the Board.[9]

The buyers in the Second Offering were the Rich Entities, the Rutchik Trust, and six other entities and individuals.[10] All but one of the purchasers had voted in favor of the Second Offering or had a relationship with someone who did. The buyers in the latter category included George Rich, Jr., who is inferably Rich's son. Only an entity called Caplin Fugue LLC does not appear at this stage of the proceeding to have a discernable relationship to a signer of the Written Consent.

---

[8] Those four are (1) Gus Bessalel, (2) Peter Jaffee, (3) David Mitchell, and (4) Neal Simon, who at the pleading-stage can be inferred to have an affiliation with the Jerry Simon Revocable Trust. Ex. 2. Bessalel and Mitchell were also employees. *See* Ex. 3.

[9] Those five are (1) Tim Webb, (2) Ariel Eckstein, (3) Cal Simmons, (4) the Seth Spaulding Trust, and (5) the Legacy Trust LLC. Ex. 2.

[10] The complaint alleges that Rutchik purchased his shares through the Rutchik Trust. Compl. ¶ 58. The list of purchasers names Rutchik, rather than the Rutchik Trust. Ex. 2. At the pleading stage, the court takes the complaint's allegation as true. There is not necessarily a conflict between the complaint and the list of purchasers because Rutchik could have opted to purchase the shares through the Rutchik Trust.

The Rich Entities acquired another 2,790,086 shares of Preferred Stock, representing 70% of the Second Offering. That purchase brought their total ownership to 11,302,056 shares of Preferred Stock, or 66% of the class. George Rich, Jr. acquired 164,122 shares of Preferred Stock, representing 5% of the Second Offering and another 1% of the class. After the Second Offering, Rich and his son controlled 44% of the Company's outstanding voting power.[11]

Rutchik acquired another 328,245 shares, representing 8% of the Second Offering. Through the Rutchik Trust, he already owned 533,398 shares of Preferred Stock, and through Nodozac, he owned another 164,122 shares, giving him a total of 1,025,765 shares, or 6% of the class. After the Second Offering, the shares Rutchik controlled carried 3.9% of the Company's outstanding voting power. If Rich and Rutchik acted together, they controlled 48% of the Company's outstanding voting power.[12]

The Second Offering raised another $2,402,754.01 for the Company. When added to the $8 million raised in the Recapitalization, the Company had raised a total of $10.4 million, before transaction costs.

The plaintiffs allege that there was no valid business justification for the Second Offering. Company management had represented to the Board that the $8 million

---

[11] 8,921,712 shares of common stock plus 17,068,751 shares of Preferred Stock = 25,990,463 total votes. The Riches owned shares of Preferred Stock carrying 11,466,178 votes. 11,466,178 / 25,990,463 = 44%.

[12] Rutchik's 1,025,765 votes plus the Riches' 11,466,178 votes = 12,491,943 votes / 25,990,463 total votes = 48%

15

provided by the original Recapitalization supplied enough growth capital to meet the Company's needs. The Company certainly did not need to acquire additional capital on the same terms as the Recapitalization. In July 2021, the Company was not in the same situation as in April, when it needed cash desperately and lacked negotiating leverage.

The Company did not comply with the Investor ROFO when conducting the Second Offering. The Company did not inform NEA of its intent to engage in the Second Offering, nor did it allow NEA to participate.

## F. The Option Grants

On July 29, 2021, the Board granted stock options to acquire 6,029,555 shares of common stock at an exercise price of $0.10 per share (the "Option Grants"). Of that total, 2,945,352 options were issued to thirty-one different employees and two advisors (the "Disinterested Grants"). The remaining 3,084,203 options, representing 51% of the total, went to the members of the Board (the "Interested Grants").

Stella received the vast majority of the Interested Grants, presumably because he was the CEO. His grant of 2,050,227 options represented two thirds of the Interested Grants and one third of the Option Grants as a whole. One fourth of Stella's options vested upon grant with the remainder vesting proportionately over a four-year period. All of the unvested options would accelerate and vest if there was both a change of control and Stella was terminated without cause within twelve months after the change in control. Stella's options thus had a double trigger for acceleration.

Rutchik received 886,265 options, representing 29% of the Interested Grants and 15% of the Option Grants as a whole. He received the largest grant of options after Stella.

16

The second-largest employee grant was 490,843 options, or 295,422 less than what Rutchik received. Rutchik's options vested proportionately over a three-year period, and his unvested options would accelerate and vest upon a change of control. Rutchik's options thus had a single trigger for acceleration.

Rich received options on 147,711 shares, the same as the sixth-highest employee after Stella. His options vested proportionately over a three-year period, and his unvested options would accelerate and vest upon a change of control. Rich's options also had a single trigger for acceleration.

## G. The Merger Negotiations And Term Sheet

While these events were transpiring, discussions with Snyk moved forward. By September 2021, Snyk and the Company were negotiating a merger agreement. In October, the Board retained an investment banker to conduct a market check in response to a formal offer from Snyk.

On December 18, 2021, the Board informed the Company's stockholders that Snyk had agreed to a term sheet to acquire the Company for $120 million in cash. That was the first time that the plaintiffs heard about the discussions with Snyk. Before then, the plaintiffs believed that the Company had abandoned its efforts to find an acquirer in April and that management was focusing on growing the business.

## H. Requests For Information

After learning of the term sheet with Snyk, the plaintiffs requested information about the timing and terms of the proposed transaction. The Company was evasive.

17

On January 19, 2022, the plaintiffs served a demand to inspect books and records under Section 220 of the DGCL. The demand expressed concern about the timing of the Recapitalization and the proposed sale of the Company. At the time, the plaintiffs did not know about the Second Offering.

The Company reacted angrily to the demand and accused the plaintiffs of attempting to derail the transaction with Snyk. The Company threatened to sue the plaintiffs. In a formal response to the demand, the Company claimed that the plaintiffs lacked a proper purpose for conducting an inspection.

After further back and forth, the Company produced some documents in response to the demand. The Company failed to produce communications between the Company and any third party regarding the transaction with Snyk.

## I. The Merger

On February 12, 2022, the Company circulated a draft merger agreement to the plaintiffs along with a joinder agreement and a Section 280G Disclosure Statement and Voting Form. The Company asked the plaintiffs to sign the joinder agreement and voting form. The cover email asserted that the plaintiffs were obligated to sign under the terms of the Drag-Along Provision.

Section 1.1 of the joinder agreement bound the signatory to vote in favor of the merger with Snyk and against any competing proposal. Section 1.2 of the joinder agreement caused the signatory to release any and all claims against the Company, the defendants, and other parties.

18

The plaintiffs offered to sign the documents if Stella and Rich each signed a sworn affirmation attesting to the fact that they had not had any communications about a potential transaction with Snyk before the Recapitalization. Their counsel indicated that they would, and the plaintiffs provided a draft affirmation.

On February 17, 2022, the Company announced that it had entered a merger agreement with Snyk and closed the transaction (the "Snyk Merger"). At closing, the Company had $5.5 million in cash on its balance sheet.

On February 18, 2022, after the Snyk Merger closed, counsel to Stella and Rich proposed a substantially narrower affirmation. Stella was not willing to affirm that (i) he did not have communications with Snyk outside the ordinary course of business before the Recapitalization or that (ii) he did not have any communications or enter into any agreements with any person associated with GRI Ventures, including Rich, about his personal post-Recapitalization economics or business opportunities that were not otherwise disclosed to the Board.

That same day, the Company provided an incomplete distribution waterfall showing only the payments to the plaintiffs. It was not until February 21, 2022, that the Company provided a full distribution waterfall. That document revealed the existence of the shares of Preferred Stock issued in the Second Offering.

The waterfall showed that the Rich Entities received $14,570,213.04 in proceeds for the 3,282,453 shares of the Preferred Stock they had purchased in the Second Offering for $2,002,296.33, reflecting an increase in value of 728%. The Rutchik Trust received $1,457,019.97 in proceeds for the 328,245 shares of the Preferred Stock it

19

purchased in the Second Offering for $200,229.45, thereby achieving the same percentage gain. On a per share basis, the Rich Entities and the Rutchik Trust bought shares of Preferred Stock at $0.61 per share. Through the Snyk Merger, they sold at $4.44 per share of Preferred Stock.

Stella, Rich, and Ruchik's options vested as a result of the Snyk Merger. In the transaction, the common stock was valued at $3.22 per share. Net of the exercise price of $0.10 per share, the option holders received $3.10 per share. The Interested Grants generated total net proceeds of $9,623,389.20: Stella received net proceeds of $6,397,158.18; Rutchik received net proceeds of $2,765,340.43; and Rich received net proceeds of $460,890.59.

In total, through the Second Offering and the Interested Grants, Rich, Rutchik, and Stella received $25,650,622.21 in net proceeds from the Snyk Merger.

Part of the defendants' gains came at the expense of the Company's other stockholders. Without the Second Offering and Interested Grants, the merger consideration that Rich, Rutchik, and Stella received for those shares would have been available for distribution pro rata to all of the stockholders. Yes, the Rich Entities and the Rutchik Trust would have received their proportionate share based on the Preferred Stock they acquired in the Recapitalization, but their pro rata share would have been a fraction of the amounts they extracted through the Second Offering and the Interested Grants. Through those transactions, the Rich Entities and the Rutchik Trust increased their net take at the expense of the Company's other stockholders. Through the Interested Grants, Stella gained all of the equity interests that provided him with a share of the merger

20

consideration. In the Legal Analysis, *infra*, this decision provides rough estimates of the amount of the diverted proceeds.

**J.      This Litigation**

On May 9, 2022, NEA and Core Capital filed this lawsuit. The operative complaint contains eight counts.

Counts I and II concern the Investor ROFO. Count I asserts that the Company breached the Management Rights Letter by failing to comply with the Investor ROFO. NEA contends that the complaint failed to provide notice of the Second Offering and did not permit NEA to participate in the Second Offering. Count II asserts that the Rich Entities and the Rutchik Trust tortiously interfered with the Management Rights Letter by participating in the Company's breach of the Investor ROFO.

Counts III, IV, and V assert claims based on the duty of disclosure. Count III alleges that Rich, Rutchik, and Stella breached their duty of disclosure as directors by failing to disclose Snyk's inquiry when soliciting stockholder approval for the Charter Amendment. Count IV alleges that the Rich Entities breached their duties as controlling stockholders by failing to disclose the Snyk inquiry in connection with stockholder approval of the Charter Amendment. Count IV alleges that the Rutchik Trust aided and abetted the fiduciaries' breaches of duty. The same counts advance similar disclosure claims directed at the Option Grants.

Counts VI, VII, and VIII challenge the Snyk Merger. Count VI contends that Rich, Rutchik, and Stella breached their fiduciary duties as directors by approving the Snyk Merger. Count VII advances a similar theory against the Rich Entities for breaching their

fiduciary duties as controlling stockholders. Count VIII alleges that the Rutchik Trust aided and abetted the fiduciaries' breaches of duty.

The defendants have moved to dismiss the complaint in its entirety. They argue that the complaint's allegations fail to state claims on which relief can be granted. They also contend that the Covenant Not To Sue bars the plaintiffs from asserting their claims. This decision addresses the first issue. The court will address the Covenant Not To Sue separately.

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) on the grounds that it fails to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

## A.    Count I: Breach Of The Investor ROFO

In Count I of the complaint, NEA asserts a claim against the Company for breach of the Investor ROFO. The Company's motion to dismiss Count I is denied.

"In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003). At the motion to dismiss stage, it is sufficient to simply allege "first, the existence

22

of the contract . . .; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Id.* at 612. So long as the complaint alleges that an "agreement[] ha[s] been breached," and even if it is not clear that the non-breaching party has "suffer[ed] immediate quantifiable harm, the equitable powers of this Court afford [it] broad discretion in fashioning appropriate relief." *Universal Studios Inc. v. Viacom Inc.*, 705 A.2d 579, 583 (Del. Ch. 1997). It is thus more accurate to describe the elements of a claim for breach of contract as "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

Count I satisfies each of these elements. The complaint alleges that NEA was a party to the Management Rights Letter which contained the Investor ROFO. That provision in turn granted NEA a ROFO on any "New Securities." Although the Management Rights Letter did not define that term, the Fourth Amended and Restated Investors' Rights Agreement (the "Investors' Rights Agreement") defined New Securities as, "collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities." Ex. 1, Ex. D at 5. The Company issued new shares of Preferred Stock in the Second Offering, which qualified as New Securities. The Company failed to provide NEA with the notice and opportunity to participate that the

23

Investor ROFO required. NEA was damaged because it was deprived of the opportunity to purchase its pro rata share of New Securities before the sale of the Company to Snyk.

The Company does not argue that NEA has failed to plead the elements of a claim for breach of contract. Instead, the Company advances two arguments for dismissal.

The first is an extreme interpretation of the Investor ROFO under which the Company had no obligation to give notice of the Second Offering until after that transaction closed. At that point, NEA could not participate in the transaction, so the Investor ROFO could not have been breached.

In reasoning its way to this nonsensical result, the Company observes that the Rich Entities, defined as the "Major Investors," possessed a ROFO right of their own under the Investors' Rights Agreement.[13] The Investor ROFO states that if the Rich Entities waive their ROFO, then that waiver also applies to NEA's ROFO. But that knock-on waiver is subject to an exception: If the Rich Entities go ahead and purchase New Securities notwithstanding their waiver, then the Investor ROFO is reactivated. In other words, the Rich Entities cannot formally waive their ROFO so that NEA loses the Investor ROFO, only to exercise their power over the Company to ensure that they could purchase New Securities notwithstanding the waiver. Focusing intently on the language of the exception, the Company notes that it technically provides that in such a case, "the

---

[13] The Investors' Rights Agreement defined "Major Investors" as the Lead Investor (*i.e.*, GRI Ventures) plus any other investor that owned at least 1,641,227 shares of Preferred Stock. Ex. 1, Ex. D at 4. Only JMI Fugue, the second of the two Rich Entities, qualified.

Company shall provide the investor the notice of such purchase of New Securities by the Major Investors and the Investor shall be entitled to participate in such Financing Transaction in accordance with the terms and conditions of [the Investor ROFO]." Ex. 1, Ex. G at 4. According to the Company, notice of the "purchase" means notice that the purchase is complete. The Company claims that notice of the "purchase" does not require notice of the Company's "intention to offer" New Securities. And once the purchase is complete (says the Company), the deal is done, and NEA has no means of enforcing its rights under the Investor ROFO.

Only a litigator reading a contract after a dispute has arisen with the goal of coming up with arguments for a client could embrace that degree of literalism. The obvious intent of the exception is to permit NEA to "participate in such Financing Transaction," which NEA cannot do if the transaction has closed and all of the securities have been purchased. The plain meaning of the provision is to reactivate the Investor ROFO by requiring the Company to give notice of the fact that the Rich Entities are purchasing securities notwithstanding their waiver of their own ROFO. The Company had an obligation to give notice so that NEA could exercise the Investor ROFO and participate. The Company failed to provide the necessary notice.

The Company's only other argument for dismissal is that the closing of the Snyk Merger terminated the Management Rights Letter and, therefore, terminated NEA's ability to bring a claim based on the Company's pre-termination breach of the Investor ROFO. That argument falls short as well.

The parties joust over whether the Management Rights Letter should have contained additional language that specified the consequences of termination. The Company argues that if NEA wanted to preserve its ability to sue for a pre-termination breach, then it should have included language to that effect. NEA responds that the obligation to include additional language runs the other way, such that if the Company wanted to eliminate liability for a prior breach, then the Company had to include language to that effect.

Parties can always contract for specific results. Those outcomes may confirm or comport with the default principles of law, or they may depart from the default principles of law. Parties negotiate in the shadow of default principles of law, and if a contract is silent, then default principles apply. When interpreting contract language, it is therefore important to know what common law rule otherwise would apply. Sometimes, contract language will track or closely resemble default principles of law, thereby enabling a court to reject a contrary interpretation of settled language that one side or the other has advanced. *E.g.*, *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch. 1989) (Allen, C.) (interpreting term of preferred stock to provide for same result as Section 242(b)(2) of the DGCL). In other cases, comparing the contract language to the default outcome will demonstrate that the plain meaning of the language calls for a different result. Either way, knowing what would happen if the contract were silent is helpful in determining plain meaning.

Under the common law default rule, the termination of a contract "results in an agreement becoming void, but that fact alone does not eliminate liability for a prior

26

breach." *AB Stable*, 2020 WL 7024929, at \*103 (noting the common law rule that an injured party may claim damages following a contractual breach and termination); *accord* 23 *Williston on Contracts* § 63.3; 3 *Farnsworth on Contracts* § 12.09, at 12-79. In order to depart from the common law rule and eliminate liability for a pre-termination breach, the contract must contain language to that effect, such as a provision stating that "[i]n the event of termination . . ., this Agreement shall forthwith become void and there shall be no liability on the part of either party . . . ."[14]

The Management Rights Letter does not contain language waiving the Company's liability for a pre-termination breach. The Management Rights Letter states that "[t]he rights described herein shall terminate and be of no further force or effect upon . . .

---

[14] *AB Stable*, 2002 WL 7024929, at \*103; *accord Yatra Online, Inc. v. Ebix, Inc.*, 2021 WL 3855514, at \*9 (Del. Ch. Aug. 30, 2021), *aff'd*, 276 A.3d 476 (Del. 2022); *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at \*133 (Del. Ch. Aug. 31, 2020), *aff'd*, 251 A.3d 1015 (Del. 2021); *see* ABA Mergers & Acqs. Comm., *Model Tender Offer Agreement* 240 (2020) (discussing exceptions to a provision contemplating no liability upon termination and stating that "[w]ithout this proviso, the language in Section 8.02 would provide that neither party would be liable for breach to the other after termination, regardless of pre-closing breaches"); Kling & Nugent, *supra*, § 15A.02 at 15A-4.3 (noting the effect of a broad elimination of liability upon termination and suggesting that "[it] is important . . . to continue and carve out a proviso to the effect that the foregoing will not relieve any party for liability for its breach of any provision prior to termination"). *Cf.* ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 280–81 (2d ed. 2010) (discussing effect-of-termination provision that did not contain liability-extinguishing language but did contain an exception for specified provisions as well as confirmatory language stating that "termination of this Agreement will not relieve a party from any liability for any Breach of this Agreement occurring prior to termination"); ABA Mergers & Acqs. Comm., *Model Asset Purchase Agreement with Commentary* 199 (2001) (discussing effect-of-termination provision without liability-extinguishing language and with confirmatory language stating that "the terminating party's right to pursue all legal remedies will survive such termination unimpaired").

consummation of a merger," but that is forward-looking language designed to address post-merger enforcement. Absent that language, the Management Rights Letter would become an obligation of the surviving company, and the Investor ROFO would apply to issuances of the surviving company's securities. *See* 8 *Del. C.* § 259 (providing that following a merger, "all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it"). The quoted language says nothing about extinguishing liability for a pre-termination breach.

To argue for a different result, the Company cites a leading treatise on mergers and acquisitions which recommends that parties who wish to avoid having a termination provision extinguish their claims "carve out a proviso to the effect that the foregoing will not relieve any party for liability for its breach of any provision prior to termination" so as to avoid being left "without a remedy." Dkt. 13 at 29 (citing Kling & Nugent, *supra*, § 15A.02 at 15A-4.3). That recommendation appropriately encourages parties to use specific language in a contract to identify the outcome they want to achieve. It does not take the position that under the common law, the termination of an agreement broadly extinguishes the parties' liability for pre-termination breaches. To the contrary, the only example that the treatise cites for the effect of termination on liability for pre-termination breaches is the *Yatra* decision, where the contract at issue specifically provided that upon termination, "there shall be no liability on the part of any party with respect thereto, except for [specified provisions] . . . and that nothing contained herein shall relieve any

28

party from liability for damages arising out of any fraud occurring prior to such termination." *Yatra*, 2021 WL 3855514, at *7. The agreement in *Yatra* contained liability-eliminating language, which this court enforced. The Management Rights Letter does not contain similar language.

Count I states a claim on which relief can be granted.

## B. Count II: Tortious Interference With Contract

In Count II of the complaint, NEA asserts a claim against the Rich Entities and the Rutchik Trust for tortiously interfering with the Management Rights Letter. This count also states a claim on which relief can be granted.

Delaware has adopted the formulation of a claim for tortious interference with contract that appears in the Restatement (Second) of Torts. *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010). Generally speaking, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other." Restatement (Second) of Torts § 766 (Am. L. Inst. 1979), Westlaw (database updated Oct. 2022) [hereinafter Restatement]. Reframed as elements, a plaintiff must plead "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted).

29

In this case, the complaint easily pleads three of the five elements of a claim for tortious interference with contract. There was a contract (the Management Rights Letter). This decision has concluded that it is reasonably conceivable that the Investor ROFO was breached, causing injury to NEA. Rich and Rutchik plainly knew about the contract, and their knowledge is imputed to the Rich Entities and the Rutchik Trust, respectively.[15]

The first of the two remaining elements is the existence of an intentional act that is a significant factor in causing the breach. To plead a claim against the Rich Entities and the Rutchik Trust, the plaintiffs must plead an intentional act by those entities. NEA alleges that the Rich Entities and the Rutchik Trust acted by written consent to approve the Charter Amendment that was necessary to effectuate the Second Offering, failed to cause the Company to provide the Investor ROFO notice to NEA, then purchased a

---

[15] *See, e.g.*, *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (imputing knowledge of member-employees to limited liability companies); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153–55 (Del. Ch. 2004) (imputing fraud claims to corporation where it designated a manager of a limited liability company and where the manager made fraudulent statements); *Nolan v. E. Co.*, 241 A.2d 885, 891 (Del. Ch. 1968) ("Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal."), *aff'd*, 249 A.2d 45 (Del. 1969); *see also* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 790, at 16–20 (perm ed., rev. vol. 2011), Westlaw (database updated Sept. 2022) ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge [of] while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation." (footnote omitted)).

majority of the shares of Preferred Stock that comprised the Second Offering. *See* Compl. ¶¶ 96–103. At the pleading stage, those steps supply the requisite intentional act.

The Rich Entities and the Rutchik Trust respond that they instructed the Company's managers to provide notice to NEA and other non-consenting stockholders. They rely on the Written Consent itself, which provides that "the appropriate officers or officers [sic] of the Corporation . . . shall be, and hereby are, authorized, empowered and directed to give notice of the corporate actions specified above, in accordance with Section 228(e) of the DGCL, to those stockholders who have not consented in writing hereto." Ex. 3 at 3. That language is not about the notice required by the Investor ROFO. It refers expressly to a statutory requirement found in Section 228(e), which states:

> Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders or members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders or members to take the action were delivered to the corporation as provided in subsection (c) of this section

8 *Del. C.* § 228(e). An instruction to fulfill the statutory notice requirement is not an instruction to fulfill the Investor ROFO's notice requirement.

In any event, the complaint sufficiently pleads that the Company did not comply with the Section 228(e) notice requirement. NEA and Core Capital allege that they did not learn about the Second Offering until they requested books and records months later, after learning of the Snyk Merger. Compl. ¶ 65.

31

Rich and Rutchik constituted a majority of the Board. As such, they were responsible for ensuring that the Company fulfilled its contractual obligations under the Investor ROFO and its statutory obligations under Section 228(e). As directors constituting a majority of the Board, Rich and Rutchik determined who would be able to purchase shares of Preferred Stock in the Second Offering and how many shares they would get. *See* Ex. 2. Only ten investors received the right to purchase shares. Four of the purchasers were the Rich Entities, Rutchik, and a person who is inferably Rich's son (George Rich, Jr.). Those four acquired 83% of the 3,938,941 shares of Preferred Stock issued in the Second Offering. The Rich Entities alone acquired 71% of the issuance. They made these purchases despite knowing that the Company was obligated to offer the New Securities first to NEA. It is reasonable to infer that the Rich Entities and the Rutchik Trust acted in conjunction with their representatives on the Board to implement the Second Offering in a manner that interfered with the Company's ability to offer to NEA the share of the New Securities to which NEA was contractually entitled. Those allegations are sufficient to plead that the Rich Entities and the Rutchik Trust intentionally acted in a manner that contributed to the breach of the Investor ROFO.

The final element is the existence of justification. "The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance." *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994). "The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a

32

legitimate part of doing business." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*26 (Del. Ch. Nov. 17, 2014). "[C]laims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete." *Agilent Techs. v. Kirkland*, 2009 WL 119865, at \*8 (Del. Ch. Jan. 20, 2009). Determining when intentional interference becomes improper requires a "complex normative judgment relating to justification" based on the facts of the case and "an evaluation of many factors." *Shearin*, 652 A.2d at 589 (internal quotation marks omitted).

The Delaware Supreme Court has adopted the factors identified in Section 767 of the Restatement as considerations to weigh when evaluating the existence of justification. *WaveDivision*, 49 A.3d at 1174. The factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Id.* Weighing the seven factors identified in the Restatement requires the court to engage in a fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case. *See* Restatement, *supra*, § 767 cmt. b ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege . . . . Since the determination of whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

33

When the defendants that a plaintiff has sued for tortious interference control an entity that was a party to the contract, the weighing of factors becomes more complex because of the need to balance the policies served by a claim for tortious interference with contract against the policies served by the corporate form.

> Ordinarily, of course, only property belonging to the corporation [that is the party to the contract] is available to satisfy obligations of the corporation. Thus, while there may be independent grounds to hold another liable for the obligations of a corporation . . . [,] those in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control. This "fact," of course, supplies one of the principal utilities of the corporate form of organization.

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987) (internal citations omitted). A party who wishes to have a parent entity or other controller backstop the obligations of the controlled entity can do so by contract, either by making the parent a party to the agreement or by obtaining a guarantee. A party should not be able to use a claim of tortious interference with contract to reap the benefits of protections that it did not obtain at the bargaining table.

At the same time, Delaware's respect for corporate separateness means that Delaware maintains a role for tortious interference even when one entity controls another. For example, Delaware law rejects the theory that "a parent and its wholly owned subsidiaries constitute a single economic unit" such that "a parent cannot be liable for interfering with the performance of a wholly owned subsidiary." *Shearin*, 652 A.2d at 590; *accord Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006). Delaware law instead balances "the significant economic interest of a parent corporation in its subsidiary," including the parent's legitimate interest in consulting with

34

its subsidiary, against the subsidiary's status as a separate entity and the interests of third parties in their contractual relationships with the subsidiary. *Shearin*, 652 A.2d at 590. The result is a limited affiliate privilege that protects a parent corporation that "pursues lawful action in the good faith pursuit of [the subsidiary's] profit making activities." *Id.* Recognizing a limited affiliate privilege is "consistent with the traditional respect accorded to the corporate form by Delaware law . . . in that it does not ignore that a parent and a subsidiary are separate entities. Rather, it recognizes that the close economic relationship of related entities requires enhanced latitude in defining what 'improper' interactions would be." *Id.* at 590 n.13 (internal citation omitted).

Here, because of the fact-intensive nature of this inquiry, it is not possible to determine at the pleading stage whether the Rich Entities and the Rutchik Trust acted with justification when they participated in the breach the of the Investor ROFO. By acting as they did, the Rich Entities and Rutchik gobbled up 82% of the Second Offering while paying the same price that Rich had extracted months earlier when the Company needed cash. By acquiring more Preferred Stock at what was inferably an undervalued price, the Rich Entities and Rutchik gained a greater ownership interest in the Company at a low basis, setting themselves up to cash in if there was a liquidity event.

It is reasonable to infer that by proceeding in this fashion, the Rich Entities and Rutchik did not cause the Company to pursue legitimate profitmaking activities. It was all the same for the Company whether the Rich Entities, Rutchik, or NEA bought the shares of Preferred Stock in the Second Offering. By acting as they did, the Rich Entities and the Rutchik Trust pursued their own advantage. If anything, they acted contrary to the

35

Company's legitimate profitmaking activities, because the Company had an interest in selling the Preferred Stock for a higher price than Rich had extracted when the Company was in desperate straits. Based on these pled facts, it is reasonably conceivable that the Rich Entities and the Rutchik Trust acted without justification.

NEA has pled a claim for tortious interference with contract against the Rich Entities and the Rutchik Trust.

## C. Count III: The Claim Against The Directors For Breach Of The Duty Of Disclosure In Connection With The Second Offering And Option Grants

In Count III of the complaint, NEA and Core Capital allege that Rich, Rutchik, and Stella breached their fiduciary duty of disclosure when seeking stockholder approval for the Second Offering and the Option Grants. The disclosure claim regarding the Option Grants is dismissed because the Option Grants did not involve any stockholder action or other identifiable disclosure issue. The disclosure claim regarding the Second Offering states a claim on which relief can be granted, but it is a derivative claim that the plaintiffs lost standing to pursue as a result of the Snyk Merger.

### 1. The Pertinent Parameters Of The Duty Of Disclosure

Directors of a Delaware corporation owe two fiduciary duties: care and loyalty. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The duty of disclosure is not an independent duty, but rather arises as "the application in a specific context of the board's fiduciary duties . . . ." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

The scope and requirements of the duty of disclosure depend on context. *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992). When confronting a disclosure claim, a court therefore must engage in a context-specific analysis to determine the source of the duty, its requirements, and any remedies for breach. *See* Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087, 1099 (1996). "Governing principles have been developed for recurring scenarios, four of which are prominent." *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013). Two of those scenarios are potentially present in this case.

The first involves a request for stockholder action. When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal election), the directors have a duty to provide the stockholders with all material information reasonably available to them. *Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009); *Delman v. GigAcquisitions3, LLC*, --- A.3d ---, ---, 2023 WL 29325, at *24 (Del. Ch. Jan. 4, 2023); *Wayport*, 76 A.3d at 314.

The second scenario involves a corporate fiduciary who speaks outside of the context of soliciting or recommending stockholder action, such as through "public statements made to the market," "statements informing shareholders about the affairs of the corporation," or public filings required by the federal securities laws. *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). "In that context, directors owe a duty to stockholders not to speak falsely." *Wayport*, 76 A.2d at 315.

37

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

*Malone*, 722 A.2d at 10; *accord id.* at 10–11 ("Shareholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors they elect to manage the corporate enterprise."). "[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Id.* at 9; *accord id.* at 14 ("When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty.").

The plaintiffs have identified reasons why the duty of disclosure could apply to the Second Offering. Most clearly, there was a request for stockholder action. To facilitate that issuance, the Company needed more authorized shares of Preferred Stock, which necessitated the Charter Amendment. As discussed in the Factual Background, the Charter Amendment required three votes: (i) an affirmative vote from holders of a majority of the voting power of the Preferred Shares and the common shares voting together as a single class, (ii) an affirmative vote from holders of a majority of the voting power of the Preferred Shares voting as a single class, and (iii) an affirmative vote from

holders of a majority of the voting power of the Preferred Shares excluding the shares held by the Rich Entities, voting as a separate class.

As the holders of a majority of the Preferred Stock, the Rich Entities could deliver the second vote themselves. Together, the entities that Rich and Rutchik controlled held shares with 44% of the Company's voting power, so they could almost deliver the first vote. Where they needed help was the third vote, where the Rich Entities' votes did not count. And if they secured that vote, then they would have more than enough votes to clear the first vote.

To secure the votes they needed, the directors solicited seventeen other holders of Preferred Stock. The ten Other Signatories signed the Written Consent. The seven Non-Signatories did not sign the Written Consent. The request to sign the Written Consent was a request for stockholder action to which the duty of disclosure applies.

The plaintiffs also argue that Stella previously had told the Board in April 2021 that the Company had failed to identify any potential acquirers, was shutting down its process, and would spend the next two to three years building its business before exploring a sale. The plaintiffs argue that when speaking in connection with the Second Offering, the directors had an obligation to update that prior disclosure, which had become false in light of the Snyk inquiry. *See Wayport*, 76 A.3d at 324 (discussing duty to update). What the plaintiffs have not done is to identify any occasion on which the directors spoke except through the solicitation of the Written Consent. The duty of disclosure in connection with a request for stockholder action is broader than the more

39

general duty to speak honestly and completely, so there is no need to analyze the separate theory.

The plaintiffs have not identified any basis for a disclosure claim in connection with the Option Grants. The Written Consent does not contain any reference to the Option Grants, and the plaintiffs have not identified any other source of stockholder action that could relate to the Option Grants. They also have not pointed to any statements by the directors regarding the Option Grants. To the extent Count III pertains to the Option Grants, the claim is dismissed.

## 2. The Disclosure-Based Challenge To The Second Offering

The plaintiffs contend that the directors breached their duty of disclosure when asking the Other Signatories to execute the Written Consent. This claim advances a novel theory, because the plaintiffs are not arguing that the directors breached their duty of disclosure when making disclosures to them or when seeking their vote. They are seeking to litigate the sufficiency of the disclosures that the directors provided to the Other Signatories. Although novel, this theory is viable under Delaware law.

### a. The Obligation To Make Disclosures When Seeking Consents From A Limited Number Of Stockholders

A threshold issue is whether Delaware law imposes a duty of disclosure when directors seek written consents from a limited number of stockholders in a private company. Precedent demonstrates that the duty exists.

The Delaware Supreme Court's decision in *Stroud* is its most significant ruling about the duty of disclosure in the context of a privately held company. In *Stroud*, the

40

stockholders in a family-owned corporation were divided into factions, with a large controlling block and a small minority block. 606 A.2d at 79–80. The controlling stockholders planned to approve amendments to the corporation's charter and by-laws at the annual meeting. *Id*. They did not need support from the minority to carry the vote, and the directors did not solicit proxies. *Id.* at 80. The only information that the directors provided in advance of the meeting was the statutorily required notice of meeting and a summary of the proposed charter amendments. *Id.* at 80, 85. A stockholder plaintiff from the minority asserted that the board of directors had a fiduciary duty to disclose all material information, and the Court of Chancery agreed. *Id.* at 86.

On appeal, the Delaware Supreme Court reversed. The high court acknowledged that "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Id.* at 84. But the court held that when directors were not seeking stockholder action, *viz.* not soliciting proxies, they only needed to comply with the statutory requirements of the DGCL. *Id.* at 87. The corporation had a duty to give notice of the meeting in compliance with Section 222(a) of the DGCL, and the corporation had a duty to disclose a summary of the proposed charter amendments as required by Section 242(b)(1) of the DGCL. *Id.* at 86. The high court rejected the trial court's view that the directors had a fiduciary duty to provide all material information reasonably available to all stockholders. *Id.* The high court held instead that

> under all of the circumstances here, the board had no duty to disclose anything beyond the requirements of section 242(b)(1) of the General Corporation Law. The board complied with its statutory duty and included

41

with its notice both the certificates of incorporation and the proposed amendments. . . . Nor is the board's conduct inequitable.

*Id.* at 87. The Delaware Supreme Court admonished the Court of Chancery to "act with caution and restraint when ignoring the clear language of the General Corporation Law in favor of other legal or equitable principles." *Id.* The Delaware Supreme Court stressed that its holding was "limited to non-public, privately-held [sic] companies." *Id.* at 86.

The *Stroud* decision involved a situation in which the minority stockholders were not being asked or required to do anything. Since *Stroud*, this court has held that the directors of a privately held company have a duty to disclose all material information reasonably available to all stockholders when giving stockholders notice of a merger that would trigger appraisal rights, even if the directors were not seeking any votes. *See Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000); *Turner v. Bernstein*, 776 A.2d 530 (Del. Ch. 2000). In *Turner*, the directors of a privately held Delaware corporation controlled a majority of the corporation's voting power, and they used their control to cause the company to sell itself to a third party, with the directors both approving the transaction at the board level and supplying the necessary stockholder-level consents. 776 A.2d at 534. After the merger closed, the directors circulated an information statement to enable stockholders to decide whether to accept the merger consideration or seek appraisal. *Id.* The information statement provided the stockholders with "extremely cursory information." *Id.* at 532. The directors "did not give the stockholders any current financial information or explain why the merger was in [their] best interests." *Id.* The stockholders "did not even receive the company's most recent financial results for the

42

periods proximate to the vote," nor "any projections of future company performance," nor "any explanation of why the [company's] board believed that the merger consideration [should be accepted]." *Id.* at 535. Writing as a Vice Chancellor, Chief Justice Strine granted summary judgment in favor of the plaintiffs, holding that the duty to disclose all material information applied and that the directors "defaulted on this obligation" where they "did not even attempt to put together a disclosure containing any cogent recitation of the material facts pertinent to the stockholders' choice." *Id.* at 542.

Then-Vice Chancellor Strine reached the same result in *Nagy*, where the directors and controlling stockholders of a privately held corporation effected a merger between the corporation and another entity that they controlled. 770 A.2d at 47. As in *Turner*, the defendants distributed a disclosure document that provided minimal information. Chief Justice Strine observed that "[a]lthough the Information Circular contained a good deal of information about how to perfect appraisal rights and the nature of an appraisal proceeding under § 262, the Information Circular was wholly devoid of other material information." *Id.* at 48. He noted that the disclosure document (i) did not provide any financial information about the buyer or the seller, (ii) did not describe the process or events leading to the merger, (iii) did not describe why the seller's board had agreed to the merger, and (iv) contained no information regarding the fact that the seller's controllers held a controlling interest in the buyer. *Id.* The fact that the defendants had not solicited the plaintiff's vote did not foreclose a disclosure claim where the plaintiff had to decide whether to accept the merger consideration or seek appraisal. *Id.* at 60.

The court took the next step in *Kurz v. Holbrook* by applying these disclosure

principles to the solicitation of consents by the directors of a privately held company. 989

A.2d 140, 183 (Del. Ch. 2010), *aff'd in part, rev'd in part on other grounds sub nom.*

*Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010). The court explained that

when directors seek stockholder action, the duty of disclosure applies "regardless of

whether a corporation is registered and publicly traded, dark and delisted, or closely

held."[16] Rather than the duty disappearing,

> [w]hat changes is not the underlying duty but rather the context-dependent
> analysis of what information is material. Factors such as the nature of the
> corporation and its business, the information already available to
> stockholders, the other information being provided in the solicitation, and
> the type of action being solicited all affect the determination of materiality.

---

[16] *Id.* In one pre-*Kurz* decision, the court had identified the issue but declined to address it. *Unanue v. Unanue*, 2004 WL 2521292, at *8 (Del. Ch. Nov. 3, 2004). In *Unanue*, three branches of a family each effectively controlled one third of the company's stock. After the patriarch of one of the branches began acting in an autocratic manner, the other two branches of the family executed written consents removing him from his position as a director. *Id.* at *4. Members of the removed patriarch's branch challenged the written consent, contending that the director-representatives of the other branches failed to disclose all material information when soliciting the written consents from their family members because they failed to disclose the removed director's side of the story. *Id.* at *4, *8. After discussing *Stroud*, this court "question[ed] whether additional disclosure duties [beyond the statutory notice requirement in Section 228(e)] should be required in the written consent context." *Id.* at *9. But this court declined to address the issue after finding that the nondisclosures were not material on the facts of the case. *Id.* at *10. The analogy to *Stroud* is dubious, because *Stroud* did not involve a request for stockholder action. The plaintiffs in *Stroud* argued that the directors owed them a duty of disclosure though no one had solicited consents or proxies from them, and even though they had no decision to make. 606 A.2d at 87. By contrast, another pre-*Kurz* decision held that when managers of a closely held LLC solicited a written consent from one of its members, they acted as fiduciaries and had "a duty to disclose all material facts bearing on the decision at issue." *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *14 (Del. Ch. Oct. 10, 2006).

*Kurz*, 989 A.2d at 183.

Since *Kurz*, this court has acknowledged that the directors of a private company owe a duty of full disclosure when selectively soliciting consents. *Kerbawy v. McDonnell*, 2015 WL 4929198, *12 (Del. Ch. Aug. 18, 2015); *see eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 31 (Del. Ch. 2010) (following *Kurz* in holding that "[f]iduciary duties apply regardless of whether a corporation is 'registered and publicly traded, dark and delisted, or closely held'" (quoting *Kurz*, 989 A.2d at 183)).

In *Kerbawy*, a director of a privately held company had assisted the holder of 5% of the common stock in soliciting consents to remove the incumbent directors and elect a new board majority. 2015 WL 4929198, at *1–2. The stockholder circulated written consent materials to a subset of the other stockholders and ultimately delivered to the company consents from holders of 53% of the outstanding stock. *Id.* at *11. The incumbent board majority refused to accept the consents, contending that disclosures that the director had made to the stockholders were materially misleading. *Id*. at *1, *5–6. In a subsequent action under Section 225 of the DGCL to determine the composition of the board, the court observed that "if a fiduciary breaches his or her disclosure obligations in connection with soliciting stockholders' votes or consents, and the Court finds that such breaches inequitably tainted the election process, that could be grounds for setting aside otherwise valid votes or consents." *Id.* at *12 (cleaned up). The court held that the director who assisted the stockholder "would be held to a duty of disclosure in this situation." *Id.* at *15. Despite making that observation, the court declined to rule on the issue because the equities of the case did not support invalidating the consents. *Id.*

Under these authorities, the Company's directors owed a duty of disclosure when asking stockholders to execute the Written Consent. That duty required that they provide the stockholders being solicited with all material information that was reasonably available, with materiality being judged based on the facts and circumstances facing a private entity in the Company's position. The Company's directors did not owe a duty of disclosure to the stockholders from whom they did not solicit consents, because those stockholders were not asked or put in a position where they were required to make any type of decision that triggered the duty.

### b. The Ability To Challenge Disclosures Made To Other Stockholders

For the plaintiffs, establishing that the Company's directors owed a duty of disclosure when they solicited consents only goes part of the way. The plaintiffs must also establish that a stockholder to whom the directors did not owe a duty of disclosure can sue a fiduciary for failing to disclose all material information to the stockholders who were owed that duty. That is a novel issue that differs from the disclosure claim advanced in *Stroud*, *Kurz*, and *Kerbawy*, because the parties asserting disclosure violations in those cases contended that they could sue based on the disclosures made or not made to them. It is also a different issue than in *Turner* and *Nagy*, where the plaintiffs had to make an investment decision.

The defendants advance a straightforward argument against the plaintiffs having standing to sue: Because no one sought consents from the plaintiffs, they cannot assert a claim for breach of the duty of disclosure. According to the defendants, only the

stockholders who delivered consents can complain about whether or not they were misled. The plaintiffs are not among the Other Signatories, so they cannot sue.

That position might have merit if the alleged disclosure violations only affected the stockholders who delivered the consents, but that is not what happens in most stockholder votes, and it is not what happened in this one. The outcome of a stockholder vote typically affects non-voting stockholders as well, either because the approval clears the way for a significant lifecycle event like a merger, sale of assets, and (as here) a charter amendment,[17] or because stockholder approval has effects on the ability of stockholders to challenge corporate action that was the subject of the vote as void or voidable,[18] or as constituting a breach of fiduciary duty.[19]

The duty of disclosure protects not just the stockholders whose votes are solicited, but the overall integrity of the voting process. "What legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization." *Kurz*, 989 A.2d at 178. The legitimating conditions for meaningful stockholder voting include aligned economic incentives, the absence of coercion, "and the presence of full information about the

---

[17] *See* 8 *Del. C.* §§ 242(b), 251(c), 271(a).

[18] *Id.* § 144(a).

[19] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312–13 (Del. 2015); *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 653–54 (Del. 2014).

47

material facts." *Id.* The importance of disclosure is so significant that Delaware law recognizes an exception to the rule that proxies and consents are voted based on the face of the document: "Where a vote is claimed to have resulted from the commission of a fraud or breach of fiduciary duty that goes to the very integrity of the election process, this Court may consider such extrinsic evidence as may be relevant to prove the fraud or breach of duty."[20]

Cases from a related area illustrate these principles. In cases where non-tendering stockholders have claimed that fiduciaries breached their duty of disclosure in connection with tender offers, the defendants have argued that because the non-tendering plaintiffs were not misled into tendering their shares, they could not assert disclosure claims. In a series of cases, Chancellor Allen rejected that argument, explaining that "a nontendering shareholder may suffer an injury, and therefore may state a claim upon which relief will be granted, when, as alleged, false information and omissions led others to tender their shares."[21] The principal difference between a tender offer and this case is that a non-

---

[20] *Parshalle v. Roy*, 567 A.2d 19, 24 n.4 (Del. Ch. 1989); *id.* at 24 (noting the exception to the face-of-the-ballot rule that applies "where the challenged vote is claimed to be a result of fraud or breach of duty"); *accord Staub v. Reading & Bates Corp.*, 1991 WL 1182613, at *2 (Del. Ch. Dec. 26, 1991) (explaining that a court can look beyond a facially valid proxy in instances involving "fraud or breach of duty"); *see Blasius Indus. Inc. v. Atlas Corp.*, 564 A.2d 651, 670 (Del. Ch. 1989) (Allen, C.) (explaining that "judges of election (and reviewing courts *absent fraud or breach of duty*) are not to inquire into [a record owner's] intention except as expressed on the face of the proxy, consent, or other ballot"); *id.* (stating that "absent fraud, or breach of duty, effect must be given to properly submitted proxies that are not inconsistent").

[21] *Freedman v. Rest. Assocs. Indus., Inc.*, 1990 WL 135923, *8 (Del. Ch. Sept. 19, 1990) (Allen, C.) (cleaned up); *see Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL

tendering stockholder knows what disclosures were made to the stockholders who tendered and can more easily plead a disclosure claim. In both settings, the stockholder that did not act in response to the disclosure violations is injured by actions that other stockholders were induced to take. That is true whether the stockholder who did not act was given the opportunity to make a decision (as in the tender offer context) or was not (as in this case).

The plaintiffs therefore have standing to challenge the disclosures that the directors provided to the Other Signatories.

### c.      Whether The Snyk Inquiry Was Material Information

The plaintiffs contend that the directors breached their duty of disclosure by failing to inform the Other Signatories about Snyk's inquiry to Stella. This claim survives

---

111134, at *21 (Del. Ch. June 24, 1991) (Allen, C.) (noting that because the plaintiff did not tender, it was not misled by any disclosure violations, but nevertheless could challenge the adequacy of the disclosure where "[i]t was plainly, though indirectly, affected by the tender offer [because it] was that transaction that put MAF in a position to exercise cash-out rights under Section 253 of the Delaware Corporation Law") (subsequent history omitted). In *Freedman*, Chancellor Allen noted that a non-tendering plaintiff is plainly injured by misleading disclosures in a tender offer that enables the tender offeror to acquire control. 1990 WL 135923, at *8. He held open the question of "[w]hether it is true that a non-tendering shareholder may be injured by misrepresentations in a tender offer made by an offeror who already has control is a different matter." *Id.* Here, the injury arises not because of a change of control, but rather through the Second Offering that the solicited consents enabled to take place. The actions of the consenting holders of Preferred Stock thus inflicted an injury directly on the Company and indirectly on the plaintiffs.

because it is not possible to determine as a matter of law that the Snyk inquiry was immaterial on the facts alleged in the complaint.

Delaware law follows the federal standard for materiality. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard from *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438 (1976)). Information is material if it "'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004) (quoting *Rosenblatt*, 493 A.2d at 944), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE). The test does not require a substantial likelihood that the information would have caused the reasonable investor to act differently, such as by changing his vote or opting not to buy, sell, or tender stock. Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt*, 493 A.2d at 944 (cleaned up). At the pleading stage, the operative question is whether the complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison*, 191 A.3d at 282. The resulting inquiry necessarily is "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law." *Chester Cnty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

The defendants argue that the Snyk inquiry was too preliminary to constitute material information that the directors have a duty to disclose. If the Company were

50

publicly traded, then that argument would prevail. But because the Company was a small, privately held entity that had recently ended a sale process and told its stockholders that a transaction was not likely to happen for two to three years, it is not possible to determine at this stage that the Snyk inquiry was immaterial as a matter of law.

In cases involving publicly traded companies, Delaware decisions have held that when the duty of disclosure applies, directors must provide stockholders with an accurate, full, and fair description of significant meetings or other interactions between target management and a bidder.[22] That includes material interactions between the target and the bidder that take place before key agreements are reached.

---

[22] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280–82 (Del. 1994) (reversing a grant of summary judgment in favor of defendants on disclosure claim where proxy failed to disclose the existence of a bid because "once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events," including the existence of the bid); *Firefighters' Pension Sys. of Kan. City v. Presidio, Inc.*, 251 A.3d 251, 261 (Del. Ch. 2021) ("It is reasonably conceivable that the existence of the tip was material information that should have been disclosed to the stockholders. The Proxy made no mention of LionTree's tip to BCP."); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (holding that plaintiff adequately pled a claim for breach of the duty of disclosure where stockholders appeared to lack information about private communications between CEO and bidders); *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *12 (Del. Ch. Oct. 12, 2016) ("[O]ur Supreme Court recognized that a partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture."); *Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (holding that negotiations between buyer's and target's CEOs were material when the parties discussed "significant terms" including "valuation"); *see also In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *33–34 (Del. Ch. Oct. 16, 2018) (finding after trial that recommendation statement omitted material information where it failed to disclose a communication between a director and a potential bidder about the bidder's

There was a time when Delaware law required an agreement in principle on price and structure before any disclosure obligation arose regarding a transaction involving a publicly traded company. *See Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 847 (Del. 1987). In *Bershad*, the Delaware Supreme Court held that a board of directors had not breached its fiduciary duties by failing to disclose "certain casual inquiries" regarding a potential transaction that the target company flatly rejected and which never led to a sale. *Id.* The high court stated: "Efforts by public corporations to arrange mergers are immaterial under the *Rosenblatt v. Getty* standard, as a matter of law, until the firms have agreed on the price and structure of the transaction." *Id.*

That is no longer the law. One year later, the Supreme Court of the United States issued its decision in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which rejected the price-and-structure rule (also known as the agreement-in-principle test) as contrary to the materiality standard set forth in *TSC Industries*. *Id.* at 232–40. The *TSC Industries* standard is the test for materiality that the Delaware Supreme Court adopted in *Rosenblatt*. 493 A.2d at 944.

In the immediate aftermath of *Basic*, it was open to question whether the agreement-in-principle rule continued to apply to public companies for purposes of Delaware law. Subsequent developments have made clear that *Bershad*'s statement no

interest in acquiring the company and the likely timeframe for a bid), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE).

longer stands as a bright-line rule. In *Alessi*, Chancellor Chandler explained why the outcome in *Bershad* made sense on its facts:

> In *Bershad*, the evidence indicated that the defendants informed inquiring parties that "Dorr-Oliver was not for sale." In addition, the one inquiring party that the plaintiff specifically identified "did not have detailed, non-public financial data on Dorr-Oliver and never seriously considered making an offer." The Court held that "since it is undisputed that: (1) Dorr-Oliver was not for sale, and (2) no offer was ever made for Dorr-Oliver, the defendants were not obligated to disclose preliminary discussions regarding an unlikely sale."

849 A.2d at 945 (cleaned up).

Chancellor Chandler explained at length why the fact-specific ruling in *Bershad* could not be read as establishing a "broad and inflexible rule" in which no duty to disclose arose until there was an agreement as to price and structure. *Id.* at 946–50. He observed that the Delaware Supreme Court provided three rationales for ruling in the defendant's favor in *Bershad*:

- "The probability of completing a merger benefiting all shareholders may well hinge on secrecy during the negotiation process." *Bershad*, 535 A.3d at 847 n.5.

- "It would be very difficult for those responsible to determine when disclosures should be made." *Id.*

- "Delaware law does not require disclosure of inherently unreliable or speculative information which tend to confuse stockholders or inundate them with an overload of information."[23]

---

[23] Chancellor Chandler drew this rationale from *Arnold*. He observed that "[a]lthough not found in *Bershad*, the Delaware Supreme Court stated in *Arnold* that this 'principle is consistent with *Bershad*.'" *Alessi*, 849 A.2d at 947 n.48 (quoting *Arnold*, 650 A.2d at 1280).

Chancellor Chandler explained that each of these considerations supported a fact-specific inquiry into whether the information in question was material and needed to be disclosed. Each consideration could weigh against disclosure in certain circumstances, but not in others.

- "The first rationale, that secrecy increases shareholder wealth in some cases, is not a justification for maintaining secrecy in all cases." *Id.* at 947.

- "The second rationale, that fiduciaries find non-disclosure of merger negotiations easier than tough decisions about when to disclose, is insufficient to justify the omission of material information . . . ." *Id.* at 948. He explained that materiality always requires a fact-based judgment in light of all of the circumstances. Any approach that makes a single fact or occurrence outcome-determinative will necessarily be over- or underinclusive. *Id.*

- "The third rationale, shareholder confusion, is the least persuasive." *Id.* The rationale improperly assumed "that investors are nitwits, unable to appreciate— even when told—that mergers are risk propositions up until the closing." *Id.*

Chancellor Chandler concluded that although each of the rationales was a valid concern, they did not justify a bright-line rule. *Id.* at 947.

Chancellor Chandler also noted that the *Basic* decision had rejected the agreement-in-principle test. The Supreme Court of the United States stated:

> We . . . find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.

*Basic*, 485 U.S. at 236. The *Basic* decision held that "[w]hether merger discussions in any particular case are material . . . depends on the facts." *Id.* at 239. The Supreme Court of the United States explained instead that whether a contingent event, such as a merger, is material "will depend at any given time upon a balancing of both the indicated

54

probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238 (cleaned up). Chancellor Chandler held that Delaware law followed the *Basic* test.[24]

For public companies, investors have a range of sources of information available, starting with the stock price itself and extending to analyst reports, news articles, market coverage, and many other forms of content. For a privately held entity like the Company, information is tougher to get, and even loose indications of value can be significant. In this case, the Company had spent the second half of 2020 and the first half of 2021 exploring strategic alternatives and searching for a buyer. In April 2021, management had told the Board, including representatives of NEA and Core Capital, that the Company had failed to find a buyer, would be focusing on growing its core business, and that it would take two to three years before the Company could be sold. Based on that assessment, the

---

[24] There are other Delaware cases which have held that preliminary merger discussions were not material, but those cases involved preliminary discussions about deals that never came to fruition, and none of them were rendered at the pleading stage. *See Wayport*, 76 A.3d at 321 (post-trial decision involving a fiduciary's disclosure obligations when buying stock from another stockholder and finding the existence of an entity's proposal was not material because the entity never accepted the company's counteroffer, no agreement on price and structure was reached, and the transaction did not come to fruition); *In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 29–30 (Del. Ch. 2004) (preliminary injunction decision holding that there was no obligation to disclose an expression of interest made by an entity other than the ultimate acquirer that "did not provide a price or structure" and was contingent on the pending deal's failure); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257, 261–62, 274–75 (Del. Ch. 1989) (post-trial decision involving the adoption of an employee stock ownership plan, not a merger, and holding that there was no obligation to disclose that an entity had "expressed its interest in a 'friendly' meeting" with management because "[i]ts only significance [was] as a possible forerunner to an acquisition proposal" that ultimately did not materialize).

Board and the Company's stockholders, including NEA and Core Capital, approved the Recapitalization.

Against that backdrop, the inbound call from Snyk's CEO to Stella was a significant development. So was his follow-up email proposing "a proper chat about a potential deep partnership or (maybe more likely) acquisition," his representation that Snyk could "dig in reasonably quickly" to determine the terms of a deal, and his suggestion that the companies sign up "a fresh MNDA and a refresh mutual demo." Ex. 5. In contrast to the six-month effort which suggested that no one saw value in the Company, Snyk's inbound call showed that someone did. And in contrast to the assessment that a sale of the Company would not be viable for two to three years, Snyk's inbound inquiry suggested the possibility of a near-term liquidity event. Those factors made the Snyk inquiry particularly significant when the Company was proposing to issue additional shares of Preferred Stock to insiders and their associates at the same price agreed to in the Recapitalization.

Under the circumstances, it is reasonably conceivable that the directors' duty of disclosure required them to say something to the effect that the Company had received a recent inbound call from a credible buyer, but that the conversation was preliminary and there were no assurances that any type of transaction would result. It is reasonably conceivable that the information would have been important to a stockholder evaluating whether to consent to the stockholder defendants and other selected investors buying more Preferred Stock at a price set three months earlier when the Company was running out of money and thought it had no other prospects. It is reasonably conceivable that the

56

information "would have assumed actual significance in the deliberations" of a stockholder deciding whether to execute the Written Consent. *Rosenblatt*, 493 A.2d at 944. Put differently, it is reasonably conceivable that the information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* At a minimum, additional discovery is warranted before making a materiality determination as a matter of law, which warrants denying the motion to dismiss. *KCG Hldgs.*, 2019 WL 2564093, at *10.

The presence of the blank signature blocks for the Non-Consenting Stockholders supports a pleading-stage inference that some stockholders declined to execute the Written Consent. There are many possible reasons why that might be so, but at the pleading stage, one plaintiff-friendly inference is that the stockholders declined because giving selected Preferred Stockholders the right to buy additional shares at the same price set three months earlier when the Company was running out of money and thought it had no other prospects represented too rich a deal for Rich, Rutchik, and their confederates. If deciding whether to sign off on the Written Consent was a close call in the first place, then the Company's receipt of an inbound inquiry, albeit preliminary, would have assumed even greater significance. It is reasonable to infer that Rich and Rutchik only secured the necessary votes by giving four of the ten Other Signatories the right to share in the fruits of the Second Offering.[25]

---

[25] One wonders if permitting an investor to participate in an undervalued offering in return for providing the votes needed for the offering to succeed could be viewed as vote buying. *See Crown*, 992 A.2d at 390 (discussing third-party vote buying). A transfer

It is reasonably conceivable that information about the Snyk inquiry "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt*, 493 A.2d at 944. At a minimum, additional discovery is warranted before making a materiality determination as a matter of law, which calls for denying the motion to dismiss. *KCG Hldgs.*, 2019 WL 2564093, at \*10.

---

of value in return for a vote is inferably present. The innovation is that the consideration for the vote is bundled with the right to participate in an undervalued offering, rather than through an unbundled side payment. Yet at a superficial level, the same might be said about any attractive third-party transaction where stockholders vote in favor to receive the merger consideration. Rather than treating that transaction as a bundled vote, our law gives the vote powerful cleansing effect. *Compare Corwin*, 125 A.3d at 312–14 (Del. 2015) (holding that a fully informed stockholder vote on a merger causes the standard of review to be an irrebuttable version of the business judgment rule) *with* James D. Cox, Tomas J. Mondino & Randall S. Thomas, *Understanding the (Ir)relevance of Shareholder Votes on M&A Deals*, 69 Duke L.J. 503, 542 (2019) ("Simply stated, the norm celebrated in *Corwin*, followed in other contexts in Delaware and well received outside of Delaware, is that it is permissible to bundle in a single resolution the deal's approval as well as a concurrent vote excusing managerial misconduct that occurred or may have occurred during that transaction."). An interested transaction where only a subset of stockholders is permitted to participate might well present a different case than *Corwin* cleansing. The idea of giving a preferential right to participate in an attractive transaction as one side of a *quid pro quo* resembles the issues involved in IPO spinning, in which bankers award pre-IPO allocations of stock to individuals who might provide future business. *See In re eBay, Inc. S'holders Litig.*, 2004 WL 253521, \*4–5 (Del. Ch. Jan. 23, 2004) (holding that ability to participate in IPOs was a corporate opportunity creating loyalty issues for directors who accepted it); *see generally* Christine Hurt, *Moral Hazard and the Initial Public Offering*, 26 Cardozo L. Rev. 711, 740–44 (2005). The issue is an intriguing one that warrants further exploration, but this decision is not the appropriate place for it.

### 3. Is The Disclosure Claim Direct Or Derivative?

A claim for breach of the duty of disclosure can be direct or derivative. To determine which it is, the court must consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

Under the *Tooley* test, a claim for breach of the duty of disclosure that arises in connection with a request for stockholder action states a direct claim. *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 n.39 (Del. 2021); *accord In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006). The duty of disclosure is owed to the stockholders themselves, who are injured when the duty is violated. Any recovery or remedy logically flows to them.

This case presents a twist on that generalization because the plaintiffs are not suing based on their own right to receive information in connection with a request for stockholder action, but rather based on a failure to disclose information to the Other Signatories. In that setting, the only harm the plaintiffs can claim flows to them indirectly, as a result of the Second Offering. I have previously attempted to explain why a claim involving the issuance of equity to an insider inflicts both an injury at the entity level and an injury at the investor level, with the injury primarily felt at the investor level and the corporate-level injury deriving only from the legal construct that a corporation's shares (representing proportionate ownership interests in the firm) are assets of the firm

59

itself.[26] But that doctrinal battle has been lost, with the Delaware Supreme Court holding definitively that claims for equity dilution are only and always derivative. *Brookfield*, 261 A.3d at 1263.

For purposes of the first prong of *Tooley*, the answer *Brookfield* requires is that only the corporation has suffered an injury. The Other Signatories have suffered an injury at the investor level because they were deprived of material information, but the suing stockholders have not suffered that injury. They have only suffered an injury by virtue of the transaction that the Written Consent approved, which was the dilutive Second Offering.

The second prong of *Tooley* generally follows the first prong, because the remedy typically flows to the injured party. The answer *Brookfield* requires is that the remedy

---

[26] *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 95–118 (Del. Ch. 2015) (holding that purchase of asset from controller in return for stock inflicted an injury that was primarily direct but, at a minimum, both derivative and direct, such that plaintiffs retained standing to pursue a claim after a subsequent controller squeeze-out*), rev'd sub nom. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) (holding that purchase of asset from controller in return for stock was solely derivative such that standing to pursue a claim was extinguished by a subsequent controller squeeze-out merger leaving plaintiff with alternative of challenging the fairness of the merger); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 654–61 (Del. Ch. 2013) (holding that interested recapitalization involving dilutive issuance inflicted an injury that was primarily direct but, at a minimum, both derivative and direct), *abrogated in part by El Paso*, 152 A.3d at 1264 (rejecting analysis of dilution claim as having both direct and derivative components).

would flow to the corporation, either by returning some or all of the shares to the corporate treasurer or through a monetary award to the corporation.[27]

Because the disclosure claim is derivative, the closing of the Snyk Merger deprived the plaintiffs of standing to pursue their disclosure claim. *See, e.g.*, *Ark. Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013); *Lewis v. Ward*, 852 A.2d 896, 904 (Del. 2004); *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984). Count III is therefore dismissed.

## D.    Counts IV and V: Claims Against The Rich Entities And The Rutchik Trust Based On The Second Offering And The Option Grants

In Counts IV and V of the complaint, the plaintiffs assert claims against the Rich Entities and the Rutchik Trust based on the Second Offering and the Option Grants. In Count IV, the plaintiffs contend that the Rich Entities were the Company's controlling stockholders, owed the same duty of disclosure in connection with the Second Offering and the Option Grants as the directors, and breached its duty as the directors did. In

---

[27] The analysis is not so simple, because a court of equity can award a stockholder-level remedy for a derivative claim. *See Goldstein v. Denner*, 2022 WL 1797224, at *15–20 (Del. Ch. June 2, 2022) (collecting authorities); *compare Deane v. Maginn*, 2022 WL 16557974, at *29 (Del. Ch. Nov. 1, 2022) (awarding investor-level recovery for derivative claim), *with Bamford v. Penfold, L.P.*, 2022 WL 2278867, at *54–56 (Del. Ch. June 24, 2022) (considering but rejecting request for stockholder-level remedy for derivative claim). That type of remedial calculus comes at the end of the case, while the *Tooley* assessment generally comes at the beginning. As a practical matter, the court's remedial flexibility means that the second prong of *Tooley* does not play much of a role in the analysis. The characterization of the injury in the first prong dominates the outcome.

Count V, the plaintiffs contend that the Rutchik Trust aided and abetted the directors and the Rich Entities in breaching their fiduciary duty of disclosure.

Counts IV and V fail to state a disclosure claim based on the Option Grants for the same reasons as Count III. Whether Counts IV and V state claims based on the Second Offering presents a relatively easy call for Count V and a more difficult call for Count IV. In the interest of brevity, this decision will not analyze those claims because each is derivative for the same reasons that Count III is derivative. The closing of the Snyk Merger deprived the plaintiffs of standing to pursue Counts IV and V, which are therefore dismissed.

**E.    Count VI: The Claim That The Director Defendants Breached Their Fiduciary Duties By Approving The Snyk Merger**

In Count VI of the complaint, NEA and Core Capital challenge the Snyk Merger on the theory that (i) it was an interested transaction that conferred unique benefits on the defendants by extinguishing the plaintiffs' standing to maintain derivative claims and (ii) the merger consideration did not take into account the value of the derivative claims. In advancing this theory, the plaintiffs allege that the Second Offering and Option Grants were interested transactions in their own right and that the defendants would not have been able to show that those transactions were entirely fair (the "Interested Transaction Claims"). Those claims are distinct from the claim for breach of the duty of disclosure in connection with the Second Offering (the "Disclosure Claim"), discussed above, which the plaintiffs sought to maintain as a direct claim, but which this decision has held to be

derivative. For purposes of the challenge to the Snyk Merger, both the Interested Transaction Claims and the Disclosure Claim are in play.

Evaluating whether the plaintiffs have stated a claim against the Snyk Merger involves a two-step process. First, the plaintiffs must show that they have standing to challenge the Snyk Merger. Second, the plaintiffs must have stated a claim against the defendants on which relief can be granted.

### 1. The Plaintiffs' Standing To Challenge The Snyk Merger

The Delaware Supreme Court has endorsed a pleading-stage framework that this court used in the *Primedia* decision to evaluate whether a plaintiff had standing to challenge a merger based on the extinguishment of derivative standing. *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 136 (Del. 2021) ("When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think that the *Primedia* framework provides a reasonable basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss."). The *Primedia* decision described the framework as follows:

> A plaintiff claiming standing to challenge a merger directly under *Parnes* because of a board's alleged failure to obtain value for an underlying derivative claim must meet a three part test. First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.

*In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 477 (Del. Ch. 2013). In this case, the plaintiffs can meet all of the *Primedia* requirements.

63

### a. Viable Derivative Claims

The first *Primedia* element is met because the plaintiffs have pled derivative claims that would survive a Rule 12(b)(6) motion to dismiss. This decision has held that the Disclosure Claim passes muster under Rule 12(b)(6). The Interested Transaction Claims do too.

### i. The Governing Law

The plaintiffs contend that Rich, Rutchik, and Stella breached their fiduciary duties when approving the Second Offering and the Option Grants. To determine whether directors have complied with their fiduciary duties, Delaware courts evaluate their actions through the lens of a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

Delaware's default standard of review is the business judgment rule. That standard of review presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." [28] Unless a plaintiff rebuts one of the elements

---

[28] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, the Delaware Supreme Court overruled seven decisions, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See* 746 A.2d 244, 253 n.13 (Del. 2000) (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The

of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[29] The business judgment rule thus provides "something as close to non-review as our law contemplates." *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257

---

*Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits the cases' cumbersome subsequent history, because stating that they were overruled by *Brehm* creates the misimpression that *Brehm* rejected a series of foundational Delaware decisions.

More recently, the Delaware Supreme Court overruled *Aronson* and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. Although the *Zuckerberg* test displaced the prior tests, cases properly applying *Aronson* and *Rales* remain good law. *Id.* This decision therefore does not identify any precedents, including *Aronson* and *Rales*, as having been overruled by *Zuckerberg*.

[29] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (internal citation omitted)).

(Del. Ch. 2013). This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009); *see generally* Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine*, 57 Vand. L. Rev. 83 (2004).

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which "is Delaware's intermediate standard of review." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 43 (Del. Ch. 2013). It applies to "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[30] Inherent in

---

[30] *Id.*; *accord Reis*, 28 A.3d at 457–59; *see Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994) ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *Dollar Thrifty*, 14 A.3d at 598 ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at

these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference.[31] Framed generally, enhanced scrutiny requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007). The Second Offering and the Option Grants do not fit any of the established situations in which enhanced scrutiny applies, rendering that standard inapplicable.

Analysis starts with the default standard of the business judgment rule. The question is whether the plaintiffs have alleged facts sufficient to rebut one of the presumptions of the business judgment rule, thereby creating a pleading-stage inference that the directors would bear the burden of proving that their actions were entirely fair. If

---

the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another.").

[31] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *accord Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13 (Del. Ch. Sept. 29, 2016); *see Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del. Ch. Dec. 10, 1998) (locating the *Unocal* and *Revlon* enhanced scrutiny standard between the business judgment rule and the entire fairness test).

the plaintiffs have alleged facts at the pleading stage that support an inference of unfairness, then the court must credit those allegations. The defendants cannot introduce evidence at the pleading stage, nor can a court weigh competing evidence. Therefore, a plaintiff who has alleged facts sufficient to rebut the business judgment rule and support an inference of unfairness will survive a Rule 12(b)(6) motion.

To change the pleading-stage standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority. *See Aronson*, 473 A.2d at 812. Consequently, to determine whether to intensify the standard of review from business judgment to entire fairness, a court counts heads. *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017). If a director-by-director analysis leaves insufficient directors to make up a board majority, then the court will review the decision for entire fairness. *Id.*

At the pleading stage, a plaintiff can prevent a director from qualifying as part of the requisite board majority by alleging that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders."[32] A plaintiff

---

[32] *Rales*, 634 A.2d at 936 (citations omitted); *accord Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."); *Pogostin*, 480 A.2d at 624 ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.").

also can prevent a director from qualifying as part of the requisite board majority by alleging that the director was sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits.[33] There are other means as well, but those two are sufficient for this case.

### ii. The Governing Law And The Second Offering

The Second Offering was an interested transaction to which the entire fairness test would apply. At the time of the Second Offering, the Board comprised Rich, Rutchik, and Stella. None qualify as disinterested and independent.

For a director to be disinterested, the director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson,* 473 A.2d at 812. The benefit that the director receives must be sufficiently material to rebut the presumption of loyalty. *Technicolor*, 634 A.2d

---

[33] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4, 1995) (Allen, C.) ("The requirement that directors exercise *independent judgment,* (*insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment*[)], directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999).

at 363. "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936.

Rich and Rutchik both approved the Second Offering and participated in it. They stood on both sides of the transaction and benefitted from it. The opportunity to buy undervalued Preferred Stock at the same price set in the Recapitalization was not shared equally with other stockholders. Perhaps they bought shares of Preferred Stock in the Second Offering as a favor or on a lark, but given that they pursued and participated in the Second Offering, it is reasonable to infer at the pleading stage that the benefit they secured was material to them. Rich and Rutchik therefore cannot qualify as disinterested for purposes of the Second Offering.

Stella was the CEO. He reported to the Board majority consisting of Rich and Rutchik, and Rich controlled the Company through the Rich Entities. Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of either a controller or a conflicted board majority.[34] Stella did not participate in the Second Offering and

---

[34] Many of the cases standing for this proposition involve the issue of disqualification for purposes of demand futility under Rule 23.1 rather than an inference of a lack of independence under Rule 12(b)(6). Rule 23.1 requires a higher pleading standard, making those precedents all the more persuasive for purposes of analysis under Rule 12(b)(6). *E.g.*, *id.* at 937 (holding that President and CEO of corporation could not impartially consider a litigation demand which, if granted, would have resulted in a suit adverse to significant stockholders); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002) ("In the case of [the CEO], to accept such a [litigation] demand would require him to decide to have Student Loan sue Citigroup, an

70

therefore was not interested in that transaction, but he was not independent of Rich and Rutchik for purposes of the decision to approve it.

Because there were no disinterested and independent directors to approve the Second Offering, the entire fairness standard applies. The plaintiffs have pled facts supporting an inference of unfairness. When approving the Second Offering, Rich, Rutchik, and Stella allowed the participating stockholders, including Rich and Rutchik and their affiliates, to acquire Preferred Stock at the same price and on the same terms that Rich had extracted three months before, in April 2021, when the Company was running out of money and had spent six months exploring a potential sale in an effort that failed to generate any interest. When Rich negotiated that transaction, he was the only

---

act that would displease a majority stockholder in a position to displace him from his lucrative CEO position."); *Mizel v. Connolly*, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999) (observing that President and CEO of corporation whose position constituted his principal employment was not independent for demand-futility purposes where underlying transaction was between corporation and its controller); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) (Allen, C.) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [the CEO and significant stockholder's] interest in the transactions that the plaintiff attacks."); *see Bakerman*, 2006 WL 3927242, at *9 (holding that reasonable doubt existed as to ability of insider managers of LLC to address a litigation demand focusing on the entity's controllers); *see also MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ("There may be a reasonable doubt about a director's independence if his or her continued employment and compensation can be affected by the directors who received the challenged benefit."); *In re Cooper Cos., Inc. S'holders Deriv. Litig.*, 2000 WL 1664167, at *6 (Del. Ch. Oct. 31, 2000) (finding reasonable doubt existed as to ability of two directors, one of whom was also CFO and Treasurer and the other who was also Vice President and General Counsel, to consider litigation demand addressing actions by other directors).

71

game in town, and he held all the cards. He was able to secure a deal that valued the Company's existing equity at only $10 million, he forced all of the existing preferred stockholders to convert their shares into common stock and give up all of their special rights, and he extracted Preferred Stock with powerful terms, including a 2x liquidation preference. After the Recapitalization injected $8 million into the Company, the situation was different. The Company had enough cash to operate for a significant period. Moreover, the Company had received the inbound expression of interest from Snyk. Although preliminary, that expression of interest changed the environment from one in which no one had shown any interest that would validate the Company's worth to one in which a third party had expressed interest in an acquisition. It is reasonable to infer that using the distressed-entity pricing from April for a non-distressed transaction in July was not entirely fair.

The defendants argue in response that just before the Recapitalization closed, Rich proposed increasing the investment round from $8 million to $10 million, but that the Board refused. They claim that after Rich joined the Board and evaluated the Company, he determined that the Company really did need more than $8 million. They say that Rich did not pursue the Second Offering selfishly, but rather because the Company needed the money.

The defendants' account departs from the allegations of the complaint, and at the pleading stage, the court must credit the plaintiffs' account. In any event, the defendants' story does not explain why it was fair to price the Second Offering on the same terms as the Recapitalization. Even assuming that the Company needed a longer runway, it was

72

not in the same position as it was in April 2021 when Rich negotiated the terms of the Recapitalization. One of the sayings in the start-up industry is that it's better to raise capital when its available than when you need it, but that does not mean you should pay for the capital that is available as if you need it.

The defendants also argue that they did not know and could not have known in July 2021 that the Snyk inquiry would blossom into the Snyk Merger. The level of confidence that the Board had in the Snyk inquiry is a contested fact, but accepting that nothing in the world is certain, that does not mean that the Board could price the Second Offering without giving any credence to the Snyk inquiry. It is reasonable to infer that the Snyk inquiry had importance as a signal of validation for the Company. Just as the failure of the six-month sale process to generate any nibbles suggested that potential acquirers did not see any value in the Company, the Snyk inquiry suggested the opposite. And it suggested that the pricing used for the Recapitalization was outdated.

Another common saying in the investment world is that you make your money when you buy, not when you sell. To benefit from the Second Offering, Rich, Rutchik, and their associates did not need to believe that the Snyk inquiry would develop into a sale. They only had to believe that the Company was worth more in July 2021 than the valuation that Rich extracted in April. It is reasonable to infer that Rich, Rutchik, and their associates held that belief and that they bought what they thought were undervalued shares of Preferred Stock in the Second Offering, expecting that an undervalued purchase price would enable them to realize a bigger gain whenever the Company was sold, whether to Snyk or to someone else.

73

It is reasonable to infer that the Second Offering would be subject to the entire fairness test and that the transaction was not entirely fair. It is therefore reasonable to infer that a derivative claim challenging the Second Offering would survive a motion to dismiss.

### iii. The Governing Law And The Option Grants

As described in the Factual Background, the Option Grants came in two flavors: the Interested Grants to Rich, Rutchik, and Stella, plus the Disinterested Grants to employees and advisors. The complaint provides no basis to infer that the Board was not disinterested and independent as to the Disinterested Grants, so the business judgment rule applies. A derivative claim challenging the Disinterested Grants would not survive a motion to dismiss.

The opposite is true for the Interested Grants. When directors determine their own compensation, they engage in self-interested conduct. *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1217 (Del. 2017). Absent some cleansing mechanism, the decision will "lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).

The Interested Grants covered 3,084,203 shares and represented 51% of the total Option Grants. Rich, Rutchik, and Stella thus granted themselves more options than they awarded to thirty-one different employees and two advisors.

74

Stella's grant of 2,050,227 options represented one third of the Option Grants. While sizable, Stella was the Company's CEO, suggesting that there could be some basis to find that his grant was entirely fair. The court cannot make that determination at the pleading stage, but giving the CEO a lot of options does comport with industry practice.

Rutchik's grant of 886,265 options seems particularly large. It comprised 15% of the Option Grants as a whole and was larger by a considerable margin than any grant other than Stella's. Perhaps there is a reason why an investor and board member received so large a grant. At the pleading stage, it is reasonable to indulge the plaintiff-friendly inference that it was partially compensation for board service and partially a *quid pro quo* for being helpful to Rich.

Rich received options on 147,711 shares, the same as the sixth-highest employee after Stella. Perhaps that was a fair amount of compensation for a director. At the pleading stage, it is reasonable to indulge the plaintiff-friendly inference that it was a self-interested giveaway.

In addition to the size of the Interested Grants, there is also reason to question their timing. They were made shortly after the Snyk inquiry, yet the exercise price was set at $0.10 per share. Recall that in the Recapitalization, the agreed-upon value of Company's pre-transaction equity was $10 million. After all of the Preferred Stock was converted into common stock, the Company's pre-transaction equity consisted of 8,921,712 common shares. The Recapitalization itself thus implicitly valued the common stock at $1.12 per share, and that was at a time when the Company needed new capital and did not believe it had any meaningful prospects for a sale. Three months later, after the

Second Offering, the Company had $10 million on its balance sheet and had received an expression of interest from Snyk. It is reasonable to infer that in July 2021, the Company's value exceeded $1.12 per common share. Yet the directors set the exercise price for the options at $0.10 per share.

A board may see fit to grant in-the-money options to employees or advisors, and assuming that decision does not violate the terms of a governing plan document, the board's decision will be protected by the business judgment rule. *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007). When directors make sizable grants of in-the-money options to themselves, the directors must establish the fairness of their actions. Using the $1.12 per share figure as a plug number, the directors granted themselves options that were in the money to the tune of $2,091,231, setting aside any increase in value above $1.12 from the Company's improved position relative to April 2021, and setting aside any additional contingent value calculated by another method, such as the Black-Scholes formula.[35]

A derivative challenge to the Interested Grants would survive a motion to dismiss under Rule 12(b)(6).

### b.    A Material Amount In The Context Of The Snyk Merger

The second *Primedia* element is met because it is reasonably conceivable that the value of the Interested Transaction Claims was material in the context of the Snyk

---

[35] Because the Company is privately held, the Black-Sholes formula does not apply directly. The point is that the options had option value, *i.e.*, contingent value over and above their intrinsic, in-the-money value.

Merger. There is no bright-line figure for materiality. *Goldstein*, 2022 WL 1797224, at *11. One place to look for pleading-stage guidance is the 5% rule of thumb that laypeople use as a rough guide. *Id.* Another source is the magnitude of the baskets that parties agree to for purposes of deal-related indemnification, because the size of those limits indicates the magnitude of loss that a party is willing to swallow before it can assert a claim to recover. The second *Primedia* element asks the same basic question: How much loss must sell-side stockholders swallow before gaining standing to assert a claim to recover that value. Studies of basket amounts suggest a rule of thumb of 0.5% to 1%. *Harris v. Harris*, 2023 WL 115541, at *12 & n.6 (Del. Ch. Jan. 6, 2023). A third place to look is the magnitude of the cash settlement payments that the Delaware Court of Chancery has approved to resolve litigation challenging transactions, measured as a percentage of the transaction value. The fact that the court has approved a settlement as fair and reasonable indicates that the amount received was material to the stockholder class that claimed to be injured in the transaction. For example, when approving a settlement of litigation challenging Kinder Morgan's acquisition of El Paso Corporation, then-Chancellor Strine described a cash settlement payment equal to approximately 0.5% of the merger consideration as "a very large monetary settlement," "a very substantial achievement for

the class," "real money," and a "very good settlement for the class."[36] Other settlements involving third-party deals suggest that amounts of 1-2% are material.[37]

Based on the complaint and the documents it incorporates by reference, it is possible to make some rough, pleading-stage estimates of the value of the Interested Transaction Claims. Working backwards from the complaint's allegations that each share of Preferred Stock received $4.44 in the deal and each share of common stock received $3.22, it is possible to estimate total deal consideration at $123,324,378.68 (without the proceeds from option exercise).[38]

---

[36] *In re El Paso Corp. S'holder Litig.*, C.A. No. 6959-CS, at 36–37, 39–40 (Del. Ch. Dec. 3, 2012) (TRANSCRIPT).

[37] *See Morrison v. Berry*, C.A. No. 12808-VCG, at 15 (Del. Ch. July 7, 2021) (TRANSCRIPT) (approving as reasonable a settlement payment equal to 2% premium to deal price; "[T]he idea that the settlement was anything short of appropriate I think would be fatuous, because this, I think, is an excellent result for the stockholder class . . . ."); *In re TIBCO Software, Inc. S'holders Litig.*, C.A. No. 10319-CB, at 44 (Del. Ch. Sept. 7, 2016) (TRANSCRIPT) (approving as reasonable a settlement payment equal to 1.2% premium to deal price; "[T]he settlement is an excellent outcome for the shareholders, in my opinion."); *see also Chester Cnty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, C.A. No. 2017-0421-KSJM, at 32 (Mar. 31, 2020) (TRANSCRIPT) (approving as reasonable a settlement payment equal to 2.3% of transaction consideration to resolve challenge to an arm's-length deal); *Appel v. Berkman*, C.A. No. 12844-VCF, at 45–46 (Del. Ch. Feb. 20, 2020) (TRANSCRIPT) (approving as reasonable and deeming "significant" a settlement payment equal to 1.1% of transaction consideration to resolve challenge to an arm's-length deal); *Chen v. Howard-Anderson*, C.A. 5878-VCL, at 40 (Del. Ch. Aug. 26, 2016) (TRANSCRIPT) (approving as reasonable a settlement payment equal to 1.7% of transaction consideration to resolve challenge to an arm's-length deal).

[38] 8,921,712 shares of common stock plus 6,029,555 additional shares from option exercise = 14,951,267 shares of common.

14,951,267 shares of common * $3.22 per share = $48,143,079.74.

The Company's simple capital structure facilitates the calculations.[39] Using the waterfall of a liquidation preference for the Preferred Shares equal to two times the purchase price of $0.61 per share, followed by a distribution of the remaining proceeds pro rata to all holders of common and Preferred Stock, it is possible to estimate that the Second Offering alone resulted in Rich, Rutchik, and Stella receiving $5 million more than they would have received if the Second Offering had not taken place. That amount represents 4% of the transaction proceeds, which is inferably a material percentage of the transaction consideration. The following table shows the more detailed calculations.[40]

---

17,068,751 shares of Preferred Stock * $4.44 = $75,785,254.44.

Total distributions include $602,955.50 from option exercise at $0.10 per share.

$48,143,079.74 + $75,785,254.44 - $602,955.50 = $123,325,378.68.

[39] For Rutchik's share, the calculations only consider the Rutchik Trust's ownership of Preferred Stock, the additional shares that Rutchik purchased in the Second Offering, and the options that Rutchik received in the Interested Grants. Rutchik appears to control Nodozac, and the court included Nodozac's holdings of Preferred Stock when calculating the voting power Rutchik controlled. The plaintiffs, however, have not named Nodozac as a defendant, and they do not appear to take issue with the amounts Rutchik received through Nodozac, so the damages calculation excludes Nodozac's shares when determining Rutchik's take.

[40] As the more detailed calculations show, excluding the Second Offering affects the defendants differently. Rich gained substantially from the Second Offering because he acquired the bulk of the additional shares of Preferred Stock, so invalidating the Second Offering causes him to lose $5.1 million. Rutchik held fewer shares of Preferred Stock and participated more through his share of the Interested Grants, so he loses $816,188. Stella only participated through common stock, so he gains by $926,026. The calculations would differ if Rutchik's holdings of Preferred Stock through Nodozac were included.

|                                                                      | Actual Transaction | Without Second Issuance |
|----------------------------------------------------------------------|-------------------:|------------------------:|
| Estimated Transaction Proceeds Excluding Option Exercise             | 123,325,378.68     | 123,325,378.68          |
| Proceeds from Option Exercise                                        | 602,955.50         | 602,955.50              |
| Total Proceeds                                                       | 123,928,334.18     | 123,928,334.18          |
| Preferred Stock Liquidation Preference                               | 20,823,876.22      | 20,823,876.22           |
| Rich Entities' Liquidation Preference                                | 13,788,508.32      | 10,384,603.40           |
| Rutchik Trust's Liquidation Preference                               | 1,051,204.46       | 650,745.56              |
| Net proceeds for participating holders                               | 103,104,457.96     | 103,104,457.96          |
| Fully diluted shares                                                 | 32,020,018.00      | 28,081,077.00           |
| Per Share Consideration                                              | 3.22               | 3.67                    |
| Rich Entities' Share of Per Share Consideration From Preferred       | 36,392,620.32      | 31,253,147.91           |
| Rich Entities' Share of Per Share Consideration From Common          | 475,629.42         | 542,346.10              |
| Rutchik Trust's Share of Per Share Consideration From Preferred      | 2,774,490.46       | 1,958,461.62            |
| Rutchik Trust's Share of Per Share Consideration From Common         | 2,853,773.30       | 3,254,072.93            |
| Rich Entities' Total Proceeds                                        | 57,692,125.96      | 52,619,370.23           |
| Rutchik Trust's Total Proceeds                                       | 6,679,468.22       | 5,863,280.11            |
| Stella's Share From Common                                           | 6,601,730.94       | 7,527,757.70            |
| Defendants' Total Proceeds                                           | 70,973,325.12      | 66,010,408.04           |
| Other Stockholders' Total Proceeds                                   | 52,955,009.06      | 57,917,926.14           |
| Other Stockholders' Damages Relative To Actual Transaction           |                    | 4,962,917.08            |
| Damages As Percentage of Deal Consideration                          |                    | 4.00%                   |
|                                                                      |                    |                         |
| Rich Delta                                                           |                    | -5,072,755.73           |
| Rutchik Delta                                                        |                    | -816,188.11             |
| Stella Delta                                                         |                    | 926,026.76              |

Based on the court's estimates, the Interested Grants alone resulted in Rich, Rutchik, and Stella receiving $5.4 million more than they would have received if the Interested Grants had not taken place. That amount represents 4.4% of the transaction proceeds, which is again a material percentage of the transaction consideration. The following table shows the more detailed calculations.[41]

---

[41] As the more detailed calculations show, excluding the Interested Grants affects the defendants differently. Rich received relatively few options relative to Stella and Rutchik, so cancelling the Interested Grants causes him to gain more from his Preferred Stock than he loses from his cancelled options, resulting in his share of the proceeds increasing by $3.4 million. Rutchik received $3.1 million from his grant, so although excluding the Interested Grants causes him to gain some from his Preferred Stock, he is a net loser to the tune of $2.6 million. Stella takes the biggest hit because he only received a share of the merger consideration through the Interested Grants, so he loses $6.6

| | Actual Transaction | Without Interested Grants |
|---|---|---|
| Estimated Transaction Proceeds Excluding Option Exercise | 123,325,378.68 | 123,325,378.68 |
| Proceeds from Option Exercise | 602,955.50 | 294,535.20 |
| Total Proceeds | 123,928,334.18 | 123,619,913.88 |
| Preferred Stock Liquidation Preference | 20,823,876.22 | 20,823,876.22 |
| Rich Entities' Liquidation Preference | 13,788,508.32 | 13,788,508.32 |
| Rutchik Trust's Liquidation Preference | 1,051,204.46 | 1,051,204.46 |
| Net proceeds for participating holders | 103,104,457.96 | 102,796,037.66 |
| Fully diluted shares | 32,020,018.00 | 28,935,815.00 |
| Per Share Consideration | 3.22 | 3.55 |
| Rich Entities' Share of Per Share Consideration From Preferred | 36,392,620.32 | 40,151,161.26 |
| Rich Entities' Share of Per Share Consideration From Common | 475,629.42 | 0.00 |
| Rutchik Trust's Share of Per Share Consideration From Preferred | 2,774,490.46 | 3,061,033.06 |
| Rutchik Trust's Share of Per Share Consideration From Common | 2,853,773.30 | 0.00 |
| Rich Entities' Total Proceeds | 57,692,125.96 | 60,975,037.48 |
| Rutchik Trust's Total Proceeds | 6,679,468.22 | 4,112,237.52 |
| Stella's Share From Common | 6,601,730.94 | 0.00 |
| Defendants' Total Proceeds | 70,973,325.12 | 65,087,275.00 |
| Other Stockholders' Total Proceeds | 52,955,009.06 | 58,532,638.88 |
| Other Stockholders' Damages Relative To Actual Transaction | | 5,577,629.82 |
| Damages As Percentage of Deal Consideration | | 4.51% |
| | | |
| Rich Delta | | 3,282,911.52 |
| Rutchik Delta | | -2,567,230.70 |
| Stella Delta | | -6,601,730.94 |

Based on the court's estimates, the combination of the Second Offering and the Interested Grants resulted in Rich, Rutchik, and Stella receiving $11.9 million more than they would have received if the Interested Grants had not taken place. That amount represents 9.7% of the transaction proceeds, which is again a material percentage of the transaction consideration. The following table shows the more detailed calculations.[42]

million. The calculations again would differ if Rutchik's holdings of Preferred Stock through Nodozac were included.

[42] Once again, the more detailed calculations show that excluding both the Second Offering and the Interested Grants affects the defendants differently. With fewer shares of Preferred Stock taking a liquidation preference, more funds fall to the pro rata

| | Actual Transaction | Without Both |
|---|---|---|
| Estimated Transaction Proceeds Excluding Option Exercise | 123,325,378.68 | 123,325,378.68 |
| Proceeds from Option Exercise | 602,955.50 | 294,535.20 |
| Total Proceeds | 123,928,334.18 | 123,619,913.88 |
| Preferred Stock Liquidation Preference | 20,823,876.22 | 20,823,876.22 |
| Rich Entities' Liquidation Preference | 13,788,508.32 | 10,384,603.40 |
| Rutchik Trust's Liquidation Preference | 1,051,204.46 | 650,745.56 |
| Net proceeds for participating holders | 103,104,457.96 | 102,796,037.66 |
| Fully diluted shares | 32,020,018.00 | 24,996,874.00 |
| Per Share Consideration | 3.22 | 4.11 |
| Rich Entities' Share of Per Share Consideration From Preferred | 36,392,620.32 | 35,004,248.48 |
| Rich Entities' Share of Per Share Consideration From Common | 475,629.42 | 0.00 |
| Rutchik Trust's Share of Per Share Consideration From Preferred | 2,774,490.46 | 2,193,522.31 |
| Rutchik Trust's Share of Per Share Consideration From Common | 2,853,773.30 | 0.00 |
| Rich Entities' Total Proceeds | 57,692,125.96 | 55,828,124.70 |
| Rutchik Trust's Total Proceeds | 6,679,468.22 | 2,844,267.87 |
| Stella's Share From Common | 6,601,730.94 | 0.00 |
| Defendants' Total Proceeds | 70,973,325.12 | 58,672,392.57 |
| Other Stockholders' Total Proceeds | 52,955,009.06 | 64,947,521.31 |
| Other Stockholders' Damages Relative To Actual Transaction | | 11,992,512.25 |
| Damages As Percentage of Deal Consideration | | 9.70% |
| | | |
| Rich Delta | | -1,864,001.26 |
| Rutchik Delta | | -3,835,200.35 |
| Stella Delta | | -6,601,730.94 |

Those are headline numbers. Any litigation involves risk, so the risk-adjusted value of the Interested Transaction Claims would be lower. It also seems likely that the defendants would be able to prove that Stella was entitled to an option grant of some magnitude. His grant is quite large, and perhaps the plaintiffs are correct that a portion of

---

distribution. Although that hurts Rich, the higher per share distribution offsets the harm. He also suffers relatively little from the cancellation of the Interested Grants. On net, he loses $1.9 million when both issuances are excluded. Rutchik owned fewer shares of Preferred Stock and received almost half of his proceeds from his option grant, so he does worse than Rich and loses $3.8 million. Stella takes the biggest hit because he only participated through the Interested Grants, so he loses $6.6 million. Here too, calculations would differ if Rutchik's holdings of Preferred Stock through Nodozac were included.

it represented a reward for supporting the Recapitalization and going along with the Second Offering. *See* Compl. ¶ 60. But some of it (maybe most or all of it) represented legitimate incentive compensation for his role as CEO. All of those issues can be hashed out later in the case. At the pleading stage, it is reasonably conceivable that the value of the Interested Transaction Claims was material.[43]

---

[43] The sophisticated parties on both sides of the v. have no doubt prepared more accurate versions of these calculations. (After all, they have the actual distribution waterfall.) The maximum ballpark damages figure of $11.9 million tells me that with big law firms involved on both sides, the costs of fully litigating the case to trial (including experts) and through an appeal could easily end up in the same neighborhood as the risk-adjusted recovery. If the plaintiffs win, then the risk-adjusted recovery likely nets out with the litigation costs. Meanwhile, the defendants pay twice, once to fund their litigators and a second time to pay damages to the plaintiffs. And if the plaintiffs lose, then there is no recovery, and both sides pay once to their litigators.

A little further exploration suggests that the lawsuit could rapidly become a negative value proposition for both sides. The plaintiffs have not sued on behalf of a class, so they cannot claim all of the potential damages. The plaintiffs have not said how many shares they own, so rough calculations are again the order of the day. The plaintiffs allege that after the Recapitalization, their "ownership interest" in the Company was 15%. *Id.* ¶ 35. I assume that means 15% of the fully diluted equity, as if calculating voting power. After the Recapitalization and before the Second Offering and Option Grants, that works out to around 331,000 shares of common stock. Assuming the plaintiffs succeed in invalidating the Second Offering and the Interested Grants, any damages award would be shared by (i) all of the holders of common stock who received merger consideration (including those who exercised the Disinterested Grants) and (ii) the holders of Preferred Stock from the Recapitalization other than the shares owned by the defendants (I again have not excluded Nodozac). That means the denominator is roughly 16 million shares, and the plaintiffs would be entitled to 21% of the headline damages figure. The plaintiffs' best-case recovery becomes $2.4 million. Big firms can burn through that before depositions start.

The venture capital players in the case market themselves as some of the best evaluators of risk in the world. One would think they could price the case and settle it (unless someone is feeling emotional or wants to make a point).

It is not necessary to engage in a similar analysis of the Disclosure Claim. That claim provides an alternative vehicle to attack the Second Offering. As the preceding discussion shows, the value of that claim is material.

### c. Whether Snyk Would Assert The Derivative Claims

The third *Primedia* element asks whether the complaint challenging the merger supports a pleading-stage inference that the acquirer would not assert the underlying derivative claims and did not provide value for them. The facts of the complaint strongly support an inference that Snyk will not assert the Interested Transaction Claims or the Disclosure Claim.

When evaluating whether an acquirer is likely to assert a derivative claim and therefore to have included value for that claim in the deal consideration, it is helpful to divide the litigation assets that an acquirer might purchase and assert into two categories: (i) external claims against third parties, such as contract claims, tort claims, and similar causes of action ("External Claims") and (ii) internal claims against sell-side fiduciaries ("Internal Claims").[44] There is no reason to think either that an acquirer would not determine disinterestedly whether to assert an External Claim or that the merger price would not incorporate an assessment of the value of that claim.[45] By contrast, there is ample reason to think that an acquirer would never assert, and therefore would not pay

---

[44] *See Primedia*, 67 A.3d at 483–84; Note, *Survival of Rights of Action After Corporate Merger*, 78 Mich. L. Rev. 250, 263–70 (1979) [hereinafter Survival of Rights].

[45] *See Primedia*, 67 A.3d at 483–84; Survival of Rights, *supra*, at 263–66.

for, Internal Claims.[46] "Acquirers buy businesses, not claims," and "[m]erger-related financial analyses focus on the business, not on fiduciary duty litigation." *Carsanaro*, 65 A.3d at 664.

There are also human dynamics at work that make suits against sell-side fiduciaries improbable:

> The acquiring company has just purchased the target company in a process run by the same directors and officers who the acquiring corporation would be suing. Would the deal have happened if the directors and officers thought they would face a suit from the buyer? For companies who regularly make acquisitions, a reputation for pursuing claims against sell-side fiduciaries would not help their business model. Moreover, directors of the acquired corporation may join the combined entity's board, and senior officers of the acquired company may become part of the ongoing management team. Those individuals would become defendants in the acquirer's lawsuit.

*Id.*

Finally, there are legal impediments. The acquirer may have agreed contractually as part of the deal documents not to sue the sell-side managers.[47] More likely, the acquirer will have committed to maintain the sell-side fiduciaries' existing indemnification and advancement rights or provide them with even broader third-party

---

[46] *Golaine v. Edwards*, 1999 WL 1271882, at *5 (Del. Ch. Dec. 21, 1999) (noting that such claims "usually die as a matter of fact"); *Penn Mart Realty Co. v. Perelman*, 1987 WL 10018, at *2 (Del. Ch. Apr. 15, 1987) ("I agree that it is highly unlikely that Pantry Pride, which now controls Revlon, will seek to redress the allegedly excessive severance payments or allegedly excessive fees and therefore these abuses (if they are abuses) are not likely to be addressed.").

[47] *See Golaine*, 1999 WL 1271882, at *4 (noting the acquirer could give up the right to sue "in the merger agreement"); *Bershad v. Hartz*, 1987 WL 6092, at *3 (Del. Ch. Jan. 29, 1987) (same).

rights.[48] An acquirer who sued would foot the bill for both sides, making litigation economically unattractive.

Rather than litigating a claim for breach of fiduciary duty against a sell-side fiduciary, a buyer is likely to sue for breach of the transaction agreement, in which the seller provided the buyer with representations about the condition of the Company. In a private company deal, a buyer almost always has a contractual right to indemnification if the buyer believes that it did not receive the business that it paid for. Those contractual remedies provide superior and more certain avenues of recovery for the buyer.

Given all of these factors, an acquirer is likely to ignore any Internal Claims against the sell-side managers and focus on "mov[ing] forward" with the business. *In re Massey Energy Co. Deriv. & Class Action Litig.*, 2011 WL 2176479, at *26 n.173. In the buyer's hands, Internal Claims "usually die as a matter of fact." *Golaine*, 1999 WL 1271882, at *4.[49]

---

[48] *See, e.g.*, *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005) ("[M]andatory advancement provisions are set forth in a great many corporate charters, bylaws and indemnification agreements."); *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1179–80, 1180 n.8 (Del. Ch. 2007) (noting arm's-length, third-party stock-for-stock merger agreement provided significant protections for directors and officers of acquired company who were defendants in then-pending derivative actions, including direct contractual indemnification from the acquirer).

[49] Before *Lewis v. Anderson*, it was understood that the acquirer's ability to bring Internal Claims against sell-side fiduciaries died not only as a matter of fact but as a matter of law. A line of cases culminating in the United States Supreme Court's decision in *Bangor Punta* held that neither the acquirer nor the post-transaction entity itself could assert Internal Claims against sell-side fiduciaries for depressing the value of the business. *See Bangor Punta Operations, Inc. v. Bangor & Aroostock R.R. Co.*, 417 U.S. 703 (1974). The *Bangor Punta* case involved sell-side managers extracting excessive

The complaint's allegations regarding the Snyk Merger, including the transaction

agreement incorporated by reference, support an inference that Snyk was buying a

---

value from their business before the acquisition. The Supreme Court of the United States reasoned that because the self-dealing transactions had depressed the value of the business, the acquirer ended up paying less to buy it. Having purchased the business for less, the acquirer got what it paid for. The acquirer therefore had no equitable right to sue the sell-side managers, recoup a portion of its purchase price, and effectively re-trade the deal. *Id.* at 710–11. Notably, under *Bangor Punta* and its predecessors, *this rule applied to the acquirer both as the owner of the new business and to the extent the acquirer sought to have the business assert the claim itself. Id.* at 713; s*ee also Midland Food Servs., LLC, v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 929–35 (Del. Ch. 1999) (explaining and applying the *Bangor Punta* doctrine); *Golaine*, 1999 WL 1271882, at \*4 n.16 ("Depending on the circumstances, the new acquiror may be barred from causing the target corporation [to sue its former fiduciaries] under . . . the [*Bangor Punta*] doctrine."); *Courtland Manor, Inc. v. Leeds*, 347 A.2d 144, 147 (Del. Ch. 1975) (same). In *Lewis v. Anderson*, however, the Delaware Supreme Court declined to apply the *Bangor Punta* doctrine to a surviving corporation and held that the post-transaction entity could assert Internal Claims against the sell-side fiduciaries. 477 A.2d at 1050–51. That decision spawned a series of difficult issues about direct versus derivative claims that have bedeviled the Delaware courts ever since. *Compare Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006) (recognizing dual-natured claim for dilution), *with Brookfield*, 261 A.3d at 1255 (overruling *Gentile*); *compare also In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 330 (Del. 1993) (using special injury test and recognizing direct claim based on stockholder-level dilution) *with Tooley*, 845 A.2d at 1033 (overruling *Tri-Star* and special injury test); *compare also Spectra Energy*, 246 A.3d at 138–39 (recognizing direct challenge to merger based on extinguishment of standing to assert derivative claim), *and Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1244–46 (Del. 1999) (permitting direct challenge to merger based on diversion of consideration that otherwise would have supported derivative claim), *with Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del. 1988) (holding that challenge to a transaction that diverted merger consideration was derivative). To climb again onto a personal soapbox, a far better doctrinal solution would be for Delaware law to apply *Bangor Punta*, hold that a buyer does not acquire Internal Claims, and allow a sell-side plaintiff to continue to litigate an Internal Claim that existed at the time of the merger for the benefit of the participants in the seller's pre-merger capital structure in order of their priority (which generally will mean for the benefit of the class of common stockholders as they existed at the effective time).

87

business, not a business plus the right to assert the Interested Transaction Claims and the Disclosure Claim against the sell-side fiduciaries. *See* Ex. 9. The representations and warranties in the merger agreement concerned the Company's business, and Snyk bargained for a contractual indemnification regime supported by an escrow fund so that it could recover post-closing if the Company was not in its as-represented condition.[50]

Unlike the plaintiffs, Snyk had no reason to be concerned about the Second Offering or the Interested Grants. The Company represented that its capital structure included those shares and options, and Snyk went forward with the acquisition on that basis. *See id.* § 3.5. Snyk also agreed that for a period of six years after the closing, it will cause the post-transaction entity "to fulfill and honor in all respects the obligations of the Company to Persons who on or prior to the Effective Time are or were directors or officers . . . pursuant to any indemnification provisions under the Charter Documents and pursuant to any indemnification agreements." *Id.* § 6.15(b).

It is reasonable to infer that Snyk will not cause the Company to challenge the Second Offering or the Interested Grants by asserting the Interested Transaction Claims or the Disclosure Claim. The third and final element of the *Primedia* test is met.

---

[50] *See id.* art. 8. The high-level statement above the line about the nature of the indemnification right is a gross oversimplification of the complex suite of provisions that the parties negotiated to govern post-closing indemnification claims, which included various qualifiers, limitations, baskets, and caps.

88

### 2. Whether The Challenge To The Snyk Merger States A Viable Claim

Meeting the *Primedia* test establishes that the plaintiff has standing to challenge a merger based on its failure to provide value for derivative claims. The existence of standing to sue does not mean that a complaint necessarily states a claim on which relief can be granted. *See Parnes*, 722 A.2d at 1246 ("Although we conclude that the Parnes complaint directly challenges the Bally merger, it does not necessarily follow that the complaint adequately states a claim for relief."). The court must separately analyze whether there are grounds to second-guess the merger.

"Any board negotiating the sale of a corporation should attempt to value and get full consideration for all of the corporation's material assets," including litigation assets. *Massey Energy*, 2011 WL 2176479, at *3; *accord Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 764 (Del. Ch. 1986) (Allen, C.). "The degree to which a court will examine a board's success at this task depends on the standard of review." *Primedia*, 67 A.3d at 486. If the business judgment rule applies to the decision to approve the merger, then the court will not second guess the board's effort.[51] If the entire fairness standard applies, then a plaintiff who has already gained standing to sue by pleading facts supporting an

---

[51] *See, e.g.*, *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *8 (Del. Ch. Mar. 31, 2009) (applying business judgment rule to decision of majority-independent board regarding merger that would affect significant pending derivative claims where company was widely held), *aff'd*, 996 A.2d 321 (Del. 2010); *Porter v. Tex. Com. Bancshares, Inc.*, 1989 WL 120358, at *5–6 (Del. Ch. Oct. 12, 1989) (applying business judgment rule to decision of majority-independent board to approve arm's-length, third-party merger that would affect standing to bring claims for mismanagement).

inference that the merger consideration did not include value for the derivative claims will have stated a claim on which relief can be granted.[52]

The analysis in this case is straightforward. Rich, Rutchik, and Stella were the directors who approved the Second Offering and the Interested Grants. Their actions gave rise to the Interested Transaction Claims and the Disclosure Claim, which were assets of the Company. *Orbit/FR*, 2023 WL 128530, at *4 (explaining that a controller's pre-transaction looting of the company gave rise to "a chose-in-action as an asset belonging to Orbit[] for breach of fiduciary duty"). Rich, Rutchik, and Stella then approved a sale of the Company to Snyk that inferably did not afford any value to those assets, and the merger simultaneously conferred a benefit on the directors by extinguishing the sell-side stockholders' standing to assert the Interested Transaction Claims and the Disclosure Claim. All three members of the Board were therefore interested in the Snyk Merger, and

---

[52] *See In re Orbit/FR, Inc. S'holders Litig.*, 2023 WL 128530, at *4 (Del. Ch. Jan. 9, 2023) (holding that stockholder had stated a direct claim challenge to a merger where the complaint alleged that a controller had systemically looted the company, giving rise to a claim for breach of fiduciary duty belonging to the company, then purchased the company at an unfair price, in part because the merger consideration afforded no value to the derivative claim); *Primedia*, 67 A.3d at 486–88 (holding that plaintiff stated a claim where the merger extinguished standing to pursue a derivative claim against a controlling stockholder and therefore conferred a unique benefit on the controlling stockholder, warranting scrutiny under the entire fairness test); *Merritt*, 505 A.2d at 765 (applying entire fairness test where merger would affect significant pending derivative claims against controlling stockholder); *see also Kohls v. Duthie*, 765 A.2d 1274, 1284–85 (Del. Ch. 2000) (declining to apply entire fairness test where merger would affect pending derivative claim against CEO and large stockholder, but where transaction was approved by special committee and conditioned on tender of 85% of shares).

90

the entire fairness test applies. *Cf. id.* at *4 (applying entire fairness test where the interested defendant was a controller).

For the reasons already discussed, it is reasonably conceivable that the consideration received by the stockholders who were not affiliated with the directors was not entirely fair because the directors approved a merger that diverted consideration to themselves through the shares of Preferred Stock issued in the Second Offering and the options granted in the Interested Grants. That is another way of saying that the consideration did not afford value for the Interested Transaction Claims and the Disclosure Claim. It is therefore reasonably conceivable that the Snyk Merger was not entirely fair. The plaintiffs have stated a claim on which relief can be granted.

**F.    Count VII: The Claim That The Rich Entities Breached Their Fiduciary Duties By Approving The Snyk Merger**

In Count VII, the plaintiffs assert a claim against the Rich Entities for breach of fiduciary duty in connection with the Snyk Merger that parallels the claim against the directors in Count VI. For reasons similar to Count VI, Count VII states a claim on which relief can be granted. Having addressed these issues laboriously for Count VI, this decision will take a more abbreviated approach to Count VII.

Initially, the plaintiffs have standing to assert the challenge to the Snyk Merger set out in Count VII under the *Primedia* test. The first element of the *Primedia* test is met because a viable derivative claim existed against the Rich Entities based on the Second Offering. That issuance was inferably an interested transaction with controlling stockholders and subject to the entire fairness test. Before the Second Offering, the Rich

91

Entities could exercise all of the Preferred Stock blocking rights and controlled one third of the Company's voting power. They also had the ability to appoint two of the Company's five directors and affect the selection of the third. And in terms of the actual facts on the ground at the time of the Second Offering, the Rich Entities controlled two out of three directors, giving them mathematical control of the Board. That aggregation of power makes it reasonably conceivable that the Rich Entities owed fiduciary duties as the Company's controlling stockholders at the time of the Second Offering. *See, e.g.*, *Voigt v. Metcalf*, 2020 WL 614999, at \*11–22 (Del. Ch. Feb. 10, 2020).

As a purchaser of shares in the Second Offering, the Rich Entities stood on both sides of the transaction and have a burden to establish that it was entirely fair. It is reasonably conceivable that the Rich Entities did not pay a fair price in the Second Offering because the Rich Entities purchased shares of Preferred Stock at the same price and on the same terms that Rich had extracted three months before, when the Company was running out of cash, had no other options, and lacked bargaining leverage. It is reasonably conceivable that the Second Offering was not the product of fair dealing based on a variety of factors, including that the transaction unfolded in secret, the votes necessary to approve the transaction came from interested parties, and there was a lack of full disclosure. In *Weinberger*, the Delaware Supreme Court held that the entire fairness standard requires compliance with the duty of disclosure.[53] On the facts of the case, it is

---

[53] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *accord Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or

reasonably conceivable that the failure to disclose the existence of a preliminary, inbound inquiry could contribute to a lack of fair process. Taken as a whole, it is reasonably conceivable that the Second Offering was not entirely fair.

The second and third elements of the *Primedia* test are met for the reasons discussed previously. The potential recovery from a challenge to the Second Offering is material in the context of the Snyk Merger, and it is reasonable to infer that Snyk would never assert the claim.

Having shown that standing exists to assert Count VII, the plaintiffs next must plead that Count VII states a viable challenge to the Snyk Merger. That challenge is viable because the Snyk Merger generated a unique benefit for the Rich Entities, the Company's controlling stockholders, by extinguishing the plaintiffs' standing to assert a derivative claim challenging the Second Offering.

---

misrepresentation."). The *Weinberger* decision referred to the duty of disclosure as the "duty of candor." 457 A.2d at 711. The Delaware Supreme Court coined this phrase in *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 279, 281 (Del. 1977). Delaware decisions used it consistently until *Stroud*, when the Delaware Supreme Court criticized the term as potentially misleading and clarified that the duty of candor "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." 606 A.2d at 84. After *Stroud*, the prevailing Delaware terminology shifted from the "duty of candor" to the "duty of disclosure." But for this history, it would be nice to use the term "duty of candor" to refer to the *Malone* obligation to speak honestly and completely, while saving the "duty of disclosure" for the obligation to disclose all material information reasonably available when requesting stockholder action.

After the Second Offering, the Rich Entities still could exercise all of the Preferred Stock blocking rights, still had the ability to appoint two of the Company's five directors and affect the selection of the third, and had increased their share of the Company's outstanding voting power from one third to 43%. And in terms of the actual facts on the ground at the time of the Snyk Merger, the Rich Entities still had mathematical control over the Board. That aggregation of power supports a reasonable inference that the Rich Entities owed fiduciary duties as the Company's controlling stockholders at the time of the Snyk Merger. *See, e.g.*, *Voigt*, 2020 WL 614999, at *11–22.

Although nominally an arm's-length deal, the Snyk Merger conferred a unique benefit on the Rich Entities by extinguishing the plaintiffs' standing to assert a derivative claim. *Orbit/FR*, 2023 WL 128530, at *4. The Rich Entities therefore have the burden of proving that the terms of the Snyk Merger were entirely fair. It is reasonably conceivable that because the Snyk Merger did not afford any value to the Company's derivative claim, the Snyk Merger was not entirely fair.

Count VII therefore states a claim on which relief can be granted.

**G.    Count VIII: The Claim That The Rutchik Trust Aided And Abetted The Fiduciary Defendants In Breaching Their Duties In Connection With The Snyk Merger**

In Count VIII, the plaintiffs assert a claim against the Rutchik Trust for aiding and abetting breaches of fiduciary duty by the directors and the Rich Entities when entering into the Snyk Merger. This claim parallels the claim against the directors in Count VI and the claim against the Rich Entities in Count VII, but seeks to implicate the Rutchik Trust on a theory of aiding and abetting. Having reviewed the issues surrounding the Snyk

94

Merger twice, this decision again takes a more abbreviated approach. To the extent Count VIII passes muster, it does so barely.

The initial question is one of standing. The first element of the *Primedia* test asks whether it is reasonably conceivable that the Rutchik Trust could have aided and abetted the directors and the Rich Entities in breaching their fiduciary duties in connection with the Second Offering, thereby giving rise to a derivative claim. To plead a reasonably conceivable claim for aiding and abetting, the complaint must allege facts to support four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach. *Malpiede*, 780 A.2d at 1096.

In light of the court's rulings regarding the directors and the Rich Entities, the only element at issue is knowing participation. That element involves two concepts: knowledge and participation. To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RBC*, 129 A.3d at 862 (internal quotation marks omitted). "[T]he question of whether a defendant acted with *scienter* is a factual determination." *Id.* Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity." *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014). For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge. *See id.*; *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at

*11 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

The knowledge element is easily satisfied. When a plaintiff alleges that a third-party acquirer knowingly participated in a breach of fiduciary duty by sell-side directors, Delaware law imposes an appropriately high pleading burden because an acquirer is expected to bargain in its own interest. *E.g.*, *In re Rouse Props., Inc., Fiduciary Litig.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018) (explaining that the buyer was "entitled to negotiate the terms of the Merger with only its interests in mind; it was under no duty or obligation to negotiate terms that benefited [the seller] or otherwise to facilitate a superior transaction for [the seller]"). A plaintiff must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest on the board or otherwise conspired with the directors to engage in a fiduciary breach. *See Malpiede*, 780 A.2d at 1097–98; *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011). Policy reasons also lead Delaware to impose a high pleading burden when a plaintiff alleges that a third-party advisor aided and abetted sell-side directors in breaching their duties. *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016).

A case involving an affiliate of an allegedly culpable fiduciary presents a different situation.[54] The claim is simply that Rutchik caused an entity that he controlled to take

---

[54] *See, e.g.*, *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 818 (Del. Ch. 2022) (inferring at pleading stage that affiliate of interested controller who acted as financial advisor for transaction aided and abetted breach of duty by controller); *La. Mun.*

action to support his efforts to effectuate an interested transaction in which he breached his duty of disclosure and extracted value from the Company for himself. Knowledge of that breach is imputed to the Rutchik Trust because Rutchik both controlled it and acted on its behalf.

On the dimension of participation, Rutchik allegedly breached his duties by (i) approving a transaction as a director that would benefit Rich and himself, (ii) voting his shares of Preferred Stock in favor of the transaction by executing the Written Consent, (iii) failing to disclose material information when soliciting Other Signatories to the Written Consent, and (iv) extracting value at the expense of the Company and its other stockholders by purchasing shares in the Second Offering. The Rutchik Trust participated in the second and fourth steps: The Rutchik Trust was the entity that held the shares of Preferred Stock and voted them when Rutchik executed the Written Consent on its

---

*Police Empls.' Ret. Sys. v. Fertita*, 2009 WL 2263406, at \*7 n.27 (Del. Ch. July 28, 2009) (inferring at pleading stage that affiliated entities that controller used to effectuate an interested transaction knowingly participated in the breach and were subject to viable claim for aiding and abetting); *see also In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at \*39 (Del. Ch. Aug. 27, 2015) (holding after trial that affiliated entities that controller used to effectuate an unfair transaction knowingly participated in the breach of duty and were jointly and severally liable with controller for aiding and abetting the breach); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at \*38 (Del. Ch. May 3, 2004) (same); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at \*15–16 (Del. Ch. Nov. 21, 1995) (Allen, C.) (denying a motion to dismiss aiding and abetting claims against controlling stockholder and his affiliates where the complaint alleged "overarching control" by the stockholder such that the court could "infer[] 'knowing' participation" by his affiliates).

behalf, and the Rutchik Trust was the entity that purchased shares of Preferred Stock in the Second Offering.

The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful. What nevertheless gives me pause is that the actions taken by the Rutchik Trust do not distinguish its conduct from other holders of Preferred Stock who did the same thing, and it seems unlikely that the plaintiffs could state claims for aiding and abetting against all of the non-fiduciaries who participated in the Second Offering. The principal difference is that the Rutchik Trust was Rutchik's affiliate, whereas the other holders of Preferred Stock were not. That distinction matters, and the cases upholding claims against the affiliates that a conflicted fiduciary used to effectuate a transaction indicate that the Rutchik Trust is a proper defendant on a claim for aiding and abetting.[55]

A better framing of the claim might be civil conspiracy. The two forms of secondary liability are quite similar, and this court has not been a stickler for terminology. *See Albert*, 2005 WL 2130607, at \*10 ("While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting."). Delaware decisions have largely equated the two theories, noting that they often cover the

---

[55] *See, e.g.*, *MultiPlan*, 268 A.3d at 818; *Fertita*, 2009 WL 2263406, at \*7 n.27; *see also Dole*, 2015 WL 5052214, at \*39; *Emerging Commc'ns,* 2004 WL 1305745, at \*38; *Carlton*, 1995 694397, at \*15–16.

same ground and that the distinctions usually are not material.[56] Our cases have viewed aiding and abetting as the larger, more encompassing theory, observing that "[b]ecause it focuses on assistance, rather than agreement, aiding-abetting rests on a broader conceptual base, one which may overlap conspiratorial conduct, or exist independent of it." *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004) (footnote omitted); *see Great Hill*, 2014 WL 6703980, at *22 ("[I]t seems likely to me that civil conspiracy is, in many cases, to borrow a term, a 'lesser-included' claim within an aiding and abetting claim . . . .").

---

[56] *See Malpiede*, 780 A.2d at 1098 n.82 (noting in reference to underlying claim for breach of fiduciary duty that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here"); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) (noting in reference to underlying claim for fraud that showing aiding and abetting would necessarily require showing "the elements of civil conspiracy were satisfied," and therefore "the aiding and abetting fraud claim may be duplicative of the civil conspiracy count"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("A claim for conspiracy to commit a breach of fiduciary duty is usually pled as a claim for aiding and abetting, and although there are differences in how the elements of the two doctrines are framed, it remains unclear to me how the two diverge meaningfully in substance or purpose."); *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) (finding that claim for aiding and abetting breach of fiduciary duty duplicated claim for civil conspiracy); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (equating claim for aiding and abetting breach of fiduciary duty with conspiracy to commit breach of fiduciary duty), *aff'd*, 906 A.2d 114 (Del. 2006); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) ("A claim for civil conspiracy (sometimes called 'aiding and abetting') requires that three elements be alleged and ultimately established . . . ."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984) (identifying the same elements for "a claim of civil conspiracy" as for aiding and abetting), *aff'd*, 575 A.2d 1131 (Del. 1990).

There remains an important difference in emphasis between the two theories: "[A]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement." *WaveDivision*, 2011 WL 5314507, at *17. The theories align in that one way to establish knowing participation is to show "an understanding between the parties 'with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.'" *In re Comverge, Inc. S'holders Litig.*, 2014 WL 6686570, at *18 (Del. Ch. Nov. 25, 2014) (quoting *Goodwin v. Live Ent., Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999)).

As between Rutchik and the Rutchik Trust, there was a single human mind—Rutchik's—that both engaged in the breach of duty and caused the Rutchik Trust to act in support of it. There were two distinct legal persons who could conspire together, and they possessed more than just an agreement or understanding with respect to their complicity in a breach of fiduciary duty; there was unity of thought. That is sufficient to support a claim for conspiracy, pled in this setting as a claim for aiding and abetting.

With the first element of the *Primedia* test met, the second and third elements are again easy. This decision has determined that the value of a derivative claim challenging the Second Offering is material in the context of the Snyk Merger. This decision also has determined that it is not reasonably likely that Snyk would assert the claim. The plaintiffs therefore have standing to assert the challenge to the Snyk Merger asserted in Count VIII.

Assessing whether Count VIII states a claim on which relief can be granted presents the same problems as the underlying derivative claim. The only element at issue is knowing participation. Rutchik allegedly breached his duties by (i) approving the Snyk

100

Merger as a director, (ii) voting his shares of Preferred Stock in favor of the transaction, and (iii) receiving value in the form of the merger consideration. Rutchik's knowledge is attributed to the Rutchik Trust, and the Rutchik Trust participated in the second and third steps as one of the entities through which Rutchik engaged in those steps. But once again, the actions taken by the Rutchik Trust do not distinguish its conduct from other holders of Company equity. The difference is that the Rutchik Trust was Rutchik's affiliate.

As before, the reasoning of cases in which this court has imposed liability on the entities that fiduciaries control and through which they engage in transactions under a theory of aiding and abetting indicates that the claim against the Rutchik Trust should proceed beyond the pleading stage. So does the alternative framing of the claim as one in which Rutchik and the Rutchik Trust engaged in a conspiracy. If nothing else, it likely will be necessary for the Rutchik Trust to be a party to the case for purposes of relief. As one of the entities through which Rutchik held his Preferred Stock, the Rutchik Trust received a disproportionate share of the merger consideration, and it is logical that if the plaintiffs prevail, then a remedial order would extend to the Rutchik Trust.

Count VIII states a claim on which relief can be granted.

### III. CONCLUSION

Counts III, IV, and V are dismissed for lack of standing. The plaintiffs have stated claims on which relief can be granted in Counts I, II, VI, VII, and VIII. This decision has not reached the defendants' separate argument that even if Counts VI, VII, and VIII allege facts supporting viable claims, the plaintiffs cannot assert those claims because of the Covenant Not To Sue.

101